**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ALLIED VAN LINES, INC.          )   Case No.
                         )
       Plaintiff,       )   FILED: JUNE 3, 2008
                         )   08CV3186       LI
       vs.              )   JUDGE   DARRAH
                         )   MAGISTRATE   JUDGE DENLOW
EDWARDS MOVERS, INC., a Massachusetts )
Corporation, WAYNE J. EDWARDS and   )
TERESA EDWARDS                )
                         )
       Defendants.     )

## COMPLAINT

NOW COMES the Plaintiff, Allied Van Lines, Inc. (hereinafter "ALLIED"), by counsel, Dombroff Gilmore Jaques & French, PC, and for its Complaint against Defendants, Edwards Movers, Inc., a Pennsylvania Corporation, Wayne J. Edwards and Teresa Edwards, alleges and states as follows:

### THE PARTIES

1.    Plaintiff, Allied, at all times was and is a corporation incorporated under the laws of the State of Delaware, having a principal place of business in Westmont, Illinois.

2.    Defendant, Edwards Movers, Inc. ("Edwards Movers"), is a Massachusetts corporation, having its principal place of business in Easton, Massachusetts.

3.    Defendant, Wayne J. Edwards ("Wayne Edwards"), is an individual and resident of the state of Massachusetts.

4.    Defendant, Teresa Edwards ("Teresa Edwards"), is an individual and resident of the state of Massachusetts.

## JURISDICTION

5.      This Court has original jurisdiction over this matter by virtue of 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000 and is between parties of diverse citizenship. Further, supplemental jurisdiction exists over all other claims pursuant to 28 U.S.C. § 1367(a).

## VENUE

6.      Venue is proper in the United States District Court, Northern District of Illinois, Eastern Division, in that a substantial part of the events and omissions giving rise to this action occurred in this District.  28 U.S.C. §§ 1391(a)(2) and (b)(2).

## FACTUAL BACKGROUND

7.      At all relevant times, Allied provided interstate transportation services for the general public.

8.      Allied offers its household goods transportation services via the use of independent agents who provide Allied with representation in local markets.

9.      On or about October 7, 2002, Wayne Edwards and Teresa Edwards executed a Guaranty of Payment ("Guaranty") whereby they each agreed to be personally liable for any and all debts of Edwards Movers to Allied. A true and correct copy of the Guaranty is attached hereto as **Exhibit "A"**.

10.      On or about March 28, 2003, Edwards Movers executed a Combined Note and Security Agreement ("Loan 12564") for the amount of $42,000. Loan 12564 was secured by one 1999 Freightliner Tractor, VIN 1FUYDXYB2XPA81702 and further identified as AVL #34561.

Pursuant to the terms of Loan 12564, the above described security was intended to secure not only the debt described in Loan 12564 but any and all debts between Edwards Movers and Allied. A true and correct copy of Loan 12564 is attached hereto as **Exhibit "C"**.

11.     On or about March 1, 2004, Edwards Movers executed a second Combined Note and Security Agreement ("Loan 14578") for the amount of $27,900. Loan 14578 was secured by one 2000 Freightliner Straight Truck, VIN 1FVGHFBA51HH05088 and further identified as AVL #21350. Pursuant to the terms of Loan 14578, the above described security was intended to secure not only the debt described in Loan 14578 but any and all debts between Edwards Movers and Allied. A true and correct copy of Loan 14578 is attached hereto as **Exhibit "D"**.

12.     On or about May 24, 2005, Edwards Movers entered into an Agency Contract ("Agency Contract") with Allied replacing its prior agency contract, in which Edwards Movers agreed to act as the independent agent of and for Allied in the local markets in and around Easton, Massachusetts.  A true and correct copy of the Agency Contract is attached hereto as **Exhibit "E"**.

13.     Pursuant to the terms of the Agency Contract, Edwards Movers maintained an Account (the "Account") with Allied. As shown by the Agent Commission Statement ("Statement") attached hereto as **Exhibit "F"**, there is an outstanding balance of $96,642.63 on the Account due and owing from Edwards Movers to Allied.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

14.     Allied repeats and realleges the allegations contained in paragraphs 1 through 13 inclusive.

15.    As part of the Agency Contract, Edwards Movers maintained an Account with Allied.

16.    As of the April 30, 2008 Statement, there is due and owing on the Account from Edwards Movers to Allied the sum of $96,642.63 (the "Balance").

17.    As of the date of this Complaint, Edwards Movers is not entitled to any additional credits and/or offsets of any sort with respect to the Balance.

18.    Despite demand, Edwards Movers has refused and continues to refuse to pay any portion of the aforesaid Balance with Allied.

## SECOND CAUSE OF ACTION
### (Detinue)

19.    Allied repeats and realleges the allegations contained in paragraphs 1 through 18 inclusive.

20.    Edwards Movers is detaining from Allied, one 1999 Freightliner Tractor, VIN 1FUYDXYB2XPA81702 and further identified as AVL #34561 and one 2000 Freightliner Straight Truck, VIN 1FVGHFBA51HH05088 and further identified as AVL #21350 (collectively, the "Collateral"). The estimated value of said Collateral is believed to exceed $30,000.

21.    Pursuant to the terms of Loans 14578 and 12564, Allied is entitled to possession of the Collateral in order to offset amounts owed to Allied by Edwards Movers on its Account.

22.    As of the date of this Complaint, the Account has an unpaid balance of $96,642.63 due and owing from Edwards Movers to Allied.

23.     Allied has a right to possession of the Collateral that is superior to that of Edwards
Movers per Loans 14578 and 12564.

24.     Allied has demanded return of the property from Edwards Movers and Edwards
Movers has refused to comply

### THIRD CAUSE OF ACTION
#### (Breach of Guaranty)

25.     Allied repeats and realleges the allegations contained in paragraphs 1 through 24
inclusive.

26.     Pursuant to the terms of the Guaranty, Wayne Edwards and Teresa Edwards
agreed to be personally liable for any and all debts owed by Edwards Movers to Allied.

27.     As of the date of this Complaint, there remains due and owing from Edwards
Movers to Allied the sum of $96,642.63 (the "Balance"), of which no portion has been paid.

28.     As of the date of this Complaint, Edwards Movers is not entitled to any additional
credits and/or offsets of any sort with respect to the Balance.

29.     Despite demand, Wayne Edwards and Teresa Edwards have refused and continue
to refuse to pay any portion of the aforesaid Balance with Allied.

### PRAYER FOR RELIEF

WHEREFORE, Allied Van Lines, Inc. prays for the following orders:

A.      On its First Cause of Action, a judgment against Edwards Moving, Inc. in the
amount of $96,642.63 plus costs and other just and proper relief;

B.      On its Second Cause of Action, for a judgment in detinue against Edwards
Movers, Inc. requiring the return of one 1999 Freightliner Tractor, VIN

1FUYDXYB2XPA81702 and further identified as AVL #34561 and one 2000 Freightliner

Straight Truck, VIN 1FVGHFBA51HH05088 and further identified as AVL #21350 within 14

days of the date of judgment so that their value may be determined and credited against other

amounts due and owing from Edwards Movers, Inc. to Allied Van Lines, Inc., including but not

limited to the judgment prayed for in Paragraphs A and C;

C.      On its Third Cause of Action, a judgment against Wayne J. Edwards and Teresa

Edwards in the amount of $96,642.63 plus costs and other just and proper relief; and

D.      That Allied have such other and further relief that the Court may deem just and

proper.

Dated: May 30, 2008

Respectfully Submitted,
ALLIED VAN LINES, INC.,
Plaintiff Herein,

By One of its Attorneys

Dennis E. French, Esq.
ARDC# 3126101
John Buscher, Esq.
ARDC# 6272012
DOMBROFF GILMORE JAQUES & FRENCH, P.C.
10 S. LaSalle St., Suite 1120
Chicago, IL 60603
(312) 781-0200

08CV3186         LI

JUDGE   DARRAH

MAGISTRATE   JUDGE DENLOW **GUARANTY OF PAYMENT**

RECEIVED

NOV 0 8 2002

~~AGENT CREDIT~~

GUARANTY given this _7ᵀᴴ_ day of _October_, 2002, by ~~Wayne J. and Theresa~~ Edwards (hereinafter called "Guarantor/s") to Allied Van Lines, Inc., (hereinafter called "Allied").

WHEREAS, Allied, pursuant to its evaluation of the financial condition of Edwards Movers, Inc., an existing agent of Allied or a company desiring to become an agent of Allied (hereinafter "Debtor"), deems it necessary and essential to the existence or continuation of an agency relationship between Allied and Debtor that Allied be furnished with additional security in the form of this Guaranty for the prompt payment of all monetary obligations due or to become due from Debtor pursuant to the Agency Agreement and successor agency agreements and Allied's Rules and Regulations; and,

WHEREAS, the undersigned desire/s to furnish a guaranty of payment in order that Debtor may maintain an agency relationship with Allied, and the undersigned hereby acknowledge/s that the maintenance of said relationship will be in its/their best interests.

NOW, THEREFORE, for and in consideration of the sum of ten dollars ($10.00) and other good and valuable consideration, the receipt whereof is hereby acknowledged to be in hand paid, the undersigned hereby agree/s as follows:

1. <u>Obligation of Guarantor/s.</u> The Guarantor/s hereby jointly and severally unconditionally guarantee/s the prompt and complete payment of any and all indebtedness of the Debtor, now and hereafter existing, and becoming due and owing to Allied including any and all costs of collection including legal fees incurred by Allied in the collection of the underlying debt or the enforcement of any provision of this guaranty. This Guaranty is an unconditional and absolute guaranty of payment irrespective of whether Allied shall have instituted any suit, action or proceeding or exhausted it remedies under any contract note or document between Allied and Debtor or taken any steps to enforce any rights against the Debtor or any other person to compel any such performance or collect all or part of any  payments and irrespective of any other circumstances or contingency.

2. <u>Terms of Guaranty.</u> This Guaranty shall continue until all the terms of the foregoing contract have been satisfactorily performed or otherwise discharged by Debtor; and the Guarantor/s shall not be released of its obligation hereunder so long as any claim of Allied against Debtor arising out of the foregoing contract is not settled or discharged in full.

3. <u>Waiver by Guarantor/s.</u> The Guarantor/s hereby waive/s notice of non-payment by the aforesaid company of any of its obligations or liabilities to Allied. The Guarantor/s further waive notice of the creation, increase, modification or discharge of any obligation of Debtor to Allied and Guarantor/s further waive notice or release of any one or more of joint Guarantor/s and agree/s that the release or discharge of any one or more of joint Guarantor/s shall not release or otherwise alter the obligation of any Guarantor/s not so released or discharged.

4. <u>Benefit.</u> This agreement shall inure to the benefit of Allied, it successors and assigns, and shall be binding upon the Guarantor/s and its/their successors.

5. <u>Waiver of Recovery.</u> Guarantor/s further waives any right of subrogation or assignment of Allied's rights against Debtor which arise out of any payment by Guarantor/s hereunder and rejects in advance

any right, whether provided for by contract or otherwise, to claim against Debtor for any payment made by Guarantor/s to Allied under this Guaranty, it being specifically agreed and understood that Guarantor/s shall in no way be entitled to recover any amount from Debtor by reason of any payment by Guarantor/s to Allied under this Guarantee.

6. <u>Bankruptcy</u>.   The obligations of the Guarantor/s under this Guaranty shall not be altered, limited, or affected by any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Debtor or by any defense which the Debtor may have by reason of the order or decision of any court or administrative body resulting from any such proceeding.

7. <u>Change of Address.</u>   The Guarantor/s hereby agree to promptly  provide Allied with any change of address from that shown below.   Guarantor/s agree/s to indemnify Allied against any expenses resulting from Guarantor'/s' failure to provide Allied with a change of address.

8. <u>Governing Law</u>.   This Guaranty shall be governed and construed and enforced in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the undersigned has/have executed this Guaranty of Payment.

**Individual Guarantor**

*Wayne J. Edwards*
Wayne J. Edwards
14 Fieldcrest Drive
South Easton, MA 02375

RECEIVED
NOV 0 8 2002
AGENT CREDIT

**Individual Guarantor**

*Theresa Edwards*
Theresa Edwards
14 Fieldcrest Drive
South Easton, MA 02375

Edwards Guaranty.doc

08CV3186       LI

JUDGE    DARRAH

MAGISTRATE    JUDGE  DENLOW

EDWARDS MOVERS, INC.
*CUSTOMER #* 0606-0

### COMBINED NOTE AND SECURITY AGREEMENT
### (CHATTEL MORTGAGE FORM FOR VEHICLES)

LOAN #12564
$42,000.00

March 28, 2003
SOUTH EASTON, MA

FOR VALUE RECEIVED, the undersigned promises to pay to the order of Allied Van Lines, Inc. at its general offices in Naperville, Illinois the principal sum of Forty Two Thousand and 00/100 dollars ($42,000.00) in lawful money of the United States of America in installments as follows: the sum of $875.00 on the 1st day of June, 2003 and a like and equal sum on the 1st day of each succeeding month for a total of 47 months and the sum of $875.00 on the 1st day of May, 2007, representing the final installment of principal, together with interest (computed on a monthly basis as described below) prior to maturity on the principal balance from time to time outstanding thereunder, payable on the aforesaid principal payment dates and at the maturity hereof (whereby acceleration or otherwise) at a fluctuating interest rate as shall be in effect from time to time, which rate per annum shall at all times be equal to 1.00 percent above the Prime Rate from time to time in effect. For the purpose of computing the monthly interest due the Prime Rate in effect on the date of this Combined Note and Security Agreement (Note) is the rate (plus add-on percentage) used to compute the interest due on the first payment date above. Thereafter, the Prime Rate in effect on the first and each subsequent payment date is the rate (plus add-on percentage) used to compute the interest due on the next succeeding payment date. The term Prime Rate shall mean the rate of interest from time to time announced by the Harris Trust and Savings Bank, Chicago, Illinois, as its prime commercial rate of interest.

On non payment when due of any installment of principal or interest, all remaining installments at the option of the holder of this note shall become immediately due and payable without demand or notice of any kind. Interest on such past due installments of principal until paid shall be calculated at a rate per annum of 2.0 percent above the foregoing rate.

I/We shall have the untrammeled option to prepay any portion of the principal amount of this note at any time during the life of this loan without penalty, and without paying any unearned interest.

To secure the payment of this note, and any and all other obligations of whatever nature owed by the undersigned to Allied Van Lines, Inc., I/we hereby mortgage Allied Van Lines, Inc. and hereby grant to Allied Van Lines, Inc. a security interest in the following property and all accessories, parts and equipment now or hereafter affixed thereto or used in connection therewith (hereinafter called the "collateral"):

ONE (1) 1999 FREIGHTLINER TRACTOR

VIN # 1FUYDXYB2XPA81702 - AVL # 34561

PAID
JAN 0 9 2008
General Electric Capital Corporation
BY
COLLECTION MANAGER

to be principally garaged at 7 Lois Lane South Easton, MA for use in its service during the life of this loan.

Until default (as herein defined) I/we may have the possession of the collateral and use the same in any lawful manner not inconsistent with the Note and Security Agreement or any policy of insurance on the collateral

To induce Allied Van Lines, Inc. to enter into this agreement, I/we warrant and agree: (1) to the extent, if any, I/we have advised Allied Van Lines, Inc. that the collateral is being acquired with the proceeds of this note, such proceeds may be disbursed by Allied Van Lines, Inc. directly to the seller of the collateral; (2) I/we have, or forthwith will acquire, full title to the collateral, and will at all times keep the collateral free and clear of all liens and claims whatsoever, other than the security granted hereunder; (3) no financing statement nor chattel mortgage covering the collateral is on file in any public office, and I/we authorize Allied Van Lines, Inc. to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by the Secured Party describing the collateral in the same manner it is described herein; and, additionally, I/we will from time to time on request by Allied Van Lines, Inc. execute such financing statement and other documents and pay the cost of filing or recording the same in all public offices deemed necessary by Allied Van Lines, Inc. do such other acts and things, all as Allied Van Lines, Inc. may request to establish and maintain a valid security interest in the collateral (free and clear of all other liens and claims whatsoever) to secure the payment of my/our liabilities under this Note and Security Agreement; (4) I/we will not sell, transfer, lease or otherwise dispose of the collateral or interest therein except with the prior written consent of Allied Van Lines, Inc. or any subsequent holder of this Note and Security Agreement; (5) I/we will at all times keep the collateral in first class condition and repair, excepting any loss, damage or destruction which is fully covered by the process of physical damage insurance; (6) I/we will at all times keep the collateral insured against loss or damage from fire, theft and other risks, in such amounts and companies under such policies and in such form, all as shall be satisfactory to Allied Van Lines, Inc. which policies shall provide the loss thereunder shall be payable to Allied Van Lines, Inc. as its interests may appear; (7) Allied Van Lines, Inc. may examine and inspect the collateral or any part thereof, wherever located, at any reasonable time or times; (8) I/we will at all times pay or cause to be paid promptly when due all taxes and assessments upon collateral or imposed for the use of operation of the collateral; (9) I/we will submit financial statements as required by Rules and Regulations of Allied Van Lines, Inc.; (10) I/we will remain an agent in good standing of Allied Van Lines, Inc.; and (11) Debtor shall not disclose to any person or entity the terms and amount of this transaction or the existence thereof without the prior written consent of Allied.

At its option, Allied Van Lines, Inc. may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the collateral, may place and pay for insurance on the collateral, upon failure of me/us to provide insurance satisfactorily to Allied Van Lines, Inc. and may pay for the maintenance, repair and preservation of the collateral. I/we agree to reimburse Allied Van Lines, Inc. on demand for any payment made or any expense incurred by Allied Van Lines, Inc. pursuant to the foregoing authorization together with interest at 18% per annum. All such indebtedness shall be secured by the security interest granted to Allied Van Lines, Inc. in the collateral all as described herein.

The occurrence of any one or more of the following events shall constitute a default (as such term is used herein): (a) non-payment when due of any amount payable on any of the liabilities or failure to perform any agreement contained herein; (b) the insolvency or inability of me/us hereunder to pay my/our debts as they mature or the making of an assignment for the benefit of my/our creditors or any proceeding instituted against or by me/us alleging that I/we are insolvent or are unable to pay my/our debts as they mature or the filing of any petition seeking relief under any federal or state bankruptcy, insolvency, receivership or similar laws; or (c) any of the warranties set forth above shall be or become false at any time; or (d) any guaranty of any part or all of the indebtedness hereunder is ;impaired by my/our action or by operation of law or otherwise, or any such guarantor dies; or (e) a default under any indenture or instrument evidencing or relating to any of my/our indebtedness for borrowed money shall happen and be continuing; or (f) I/we became disaffiliated with Allied Van Lines, Inc.; or (g) Allied Van Lines, Inc. feels insecure for any other reason whatsoever; whenever a default shall be existing this Note and all other liabilities may, at the option of Allied Van Lines, Inc. and without demand or notice of any kind, be declared, and thereupon shall immediately become due and payable, and Allied Van Lines, Inc. may exercise from time to time any rights and remedies available to it under applicable law.

I/we agree, in case of default, to make the collateral available at a convenient place acceptable to Allied Van Lines, Inc. and to pay all costs incurred by Allied Van Lines, Inc. in the collection of this Note and all liabilities hereunder, and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses. Any proceeds of any disposition of the collateral may be applied by Allied Van Lines, Inc. to the payment of expenses in connection with the collateral, including reasonable attorney's fees and legal expenses, and any balance of such proceeds may be paid to me/us.

Upon such default Allied Van Lines, Inc. shall, in addition to the foregoing, have: (1) all the rights and remedies of a secured party of the Uniform Commercial Code of Illinois (regardless of whether said Code has been enacted in the jurisdiction where such right or remedies are asserted), including without limitation the right to take immediate and exclusive possession of the collateral, or any part thereof, and for that purpose may, with or without judicial process enter upon any premises on which the collateral may be situated and remove the same therefrom; (2) to remove any part or all of the collateral from its registered services; and (3) to offset from time to time and at any time, without limit and without any court proceeding or notice to me/us, any monetary obligation it owes me/us against any obligation of whatever nature owed by me/us to Allied Van Lines, Inc. The requirement of reasonable notice required by said Code shall conclusively be deemed to have been met if such notice is mailed, postage prepaid, to my/our address shown at the end of this Agreement at least five days before the time of the sale or disposition of the collateral. Allied Van Lines, Inc. may buy the collateral at any public or private sale thereof.

The remedies of Allied Van Lines, Inc. hereunder are cumulative and the exercise of any one or more of the remedies provided for herein, under said Code, or under other applicable law shall not be considered as a waiver of any of the other remedies of Allied Van Lines, Inc. No waiver by Allied Van Lines, Inc. of any default shall operate as a waiver of any other default or of the same default on a future occasion. All rights of Allied Van Lines, Inc. hereunder shall inure to the benefit of its successors and assigns, and all

3

PAID

JAN 0 9 2008

General Electric Capital Corporation

BY

COLLECTION MANAGER

my/our obligations shall bind my/our heirs, executors, administrators, successors, or assigns. If there be more than one Debtor hereunder all our obligations shall be joint and several.

To further secure payment hereof, I/we irrevocably authorize any attorney of any Court of Record to appear for me/us, in term time or vacation, at any time and from time to time after payment is due, whether by acceleration or otherwise, and confess judgment, without process, in favor of Allied Van Lines, Inc. against me/us for such amount as may be unpaid hereunder, together with the costs of such proceeding and attorney's fees of 15% of the amount unpaid hereunder, and waive and release all errors which may intervene in any such proceeding and consent to immediate execution upon said judgment, hereby ratifying and confirming all that my/our said attorney may do by virtue hereof.

All rights of Allied Van Lines, Inc. in, to and under this Agreement shall pass to and may be exercised by an assignee of Allied Van Lines, Inc. I/we agree that my/our liability to such assignee shall be immediate and absolute, and that I/we will not set up any claim against Allied Van Lines, Inc. as a defense counterclaim or set-off to any action brought by any such assignee for the unpaid balance owed hereunder.

This Note and Security Agreement shall be deemed to have been delivered by both the Debtor and Secured Party at Naperville, Illinois (site of the General Offices of Allied Van Lines, Inc.), and shall be governed by the laws of the State of Illinois, to the optimum possible extent, for the sake and purpose of achieving uniformity in terms and conditions on loans made by Allied Van Lines, Inc. to its borrowing agents.

This loan will become effective and interest begins accruing on February 15, 2003, or on the date the loan proceeds are released and the equipment is picked up.

This Note and Security Agreement has been duly executed on the date at the place first above-mentioned.

ALLIED VAN LINES, INC.  
Secured Party

By. _____  
(Authorized Signature)

ADDRESS OF SECURED PARTY

700 Oakmont Lane  
Westmont, IL 60559

EDWARDS MOVERS, INC.  
Debtor

By: _____  
(Authorized Signature)

ADDRESS OF DEBTOR:

7 Lois Lane  
South Easton, MA 02375

General Electric Capital Corporation  
JAN 09 2008  
BY: _____  
Collection Manager

## MINUTES OF SPECIAL

A Special Meeting of the Board of Directors of __**EDWARDS MOVERS, INC.**__ #0606-0 of South Easton, Massachusets was held on the  31st day of  _MARCH_ , 20 _03_ pursuant to written waivers of notice duly executed by all the Directors of the corporation.

A quorum of the Directors of the corporation was present, in accordance with the Articles of Incorporation and Bylaws of the corporation.

The Chairman called the meeting to order. Upon motion duly made, seconded and carried, the following Resolution was adopted:

RESOLVED, that the President of the Corporation, or any Vice President thereof in his place and stead, is hereby authorized to borrow on **Loan #12564** from **Allied Van Lines, Inc.** of Naperville, Illinois, pursuant to all of the terms and conditions of its standard Equipment Loan Plan for its hauling agents, the within stated amount of money to finance the purchase of the following described vehicle(s) for full-time use in Allied's service for the within stated period of time, and at the within stated rate of simple interest on the principal sum remaining from time to time unpaid; to execute Allied's standard Combined Note and Security agreement under the Uniform Commercial Code of Illinois evidencing Allied's loan terms and its first lien and security interest in the said vehicle(s); and to execute any and all documents necessary, in the sole judgment of Allied, to effectuate the above stated purposes.

    1.    LOAN TERMS

        Amount: $42,000.00
        Number of Monthly Installments:  48
        Amount of Monthly Installments:   $875.00 x 47 + $875.00 x 1 + Interest

        Rate of Interest: A variable rate of 1.00% over prime per annum
        Due Dates-Interest and Principal:  From 6-1-03 to 5-1-07

    2.    DESCRIPTION

        ONE (1) 1999 FREIGHTLINER TRACTOR

        VIN # 1FUYDXYB2XPA81702     AVL # 34561

_Wayne Edwards_
Chairman of the Meeting

I hereby certify that the above and foregoing is a true and correct copy of the Resolution adopted by EDWARDS MOVERS, INC. by its Board of Directors, at the special Meeting called for this purpose on the _____ day of _March_ , 2003, at _Easton MA_ .

Secretary of the Meeting

4112332.001                        12564

# INDIANA CERTIFICATE OF TITLE

State Form 8607 (R8/9-02)
Form Approved by State Board of Accounts 1999

| VEHICLE IDENTIFICATION | YEAR | MAKE | MODEL | BODY STYLE |
|---|---|---|---|---|
| 1FUYDXYB2XPA91702 | 1999 | FRT | NA | TC |
| | | | | LEGEND(S) |

| PURCHASE DATE | ISSUE DATE | ODOMETER | |
|---|---|---|---|
| 04/11/03 | 08/23/04 | EXEMPT | *CORRECTION |

OWNER(S) NAME AND ADDRESS

EDWARDS MOVERS INC                    34561
7 LOTS LANE
SOUTH EASTON    MA    02375

MAILING ADDRESS

GENERAL ELECTRIC CAPITAL CORP
1415 W 22ND ST STE 400
OAK BROOK        IL    60523-2023

1st
LIEN

GENERAL ELECTRIC CAPITAL CORP
1415 W 22ND ST / 400
2nd    OAK BROOK      IL    60523
LIEN    ALLIED VAN LINES INC
5001 US HWY 30
FORT WAYNE                    IN

## LIEN RELEASES

First Release by **General Electric Capital Corporation**

| Title | Date (mo., day, yr.) |
|---|---|
| Collection MGR | 01/09/08 |

Second Release by:

| Title | Date (mo., day, yr.) |
|---|---|
| | |

| SELLER MUST COMPLETE | PURCHASER'S INFORMATION |
|---|---|

We attest or affirm that the information entered on this form is correct. We understand that a false statement may constitute the crime of perjury.

| I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked. | Name of purchaser | | Dealer number |
|---|---|---|---|
| ☐ The odometer reading stated is in excess of its mechanical limits. | Address | | |
| ☐ The odometer reading is NOT actual mileage. WARNING - ODOMETER DISCREPANCY | | | |
| Signature of seller          Position | City | State | ZIP code |
| Signature of seller          Position | Lienholder | | |
| Printed name of seller | Address | | |
| Printed name of seller | City | State | ZIP code |

| | Selling price $ | Trade in price (if any) $ | Total price paid $ | I am aware of the odometer statements made by seller(s). |
|---|---|---|---|---|
| | | | | Signature of purchaser |

The Commissioner of the Bureau of Motor Vehicles, pursuant to the laws of the State of Indiana, certifies that the vehicle has been duly titled and the owner of the described vehicle is the owner of the motor vehicle listed herein.

Printed name of purchaser

INVENTORY CONTROL NO.          COMMISSIONER          TITLE NUMBER

B9331242          MARY L. DEPPEZ          04170160034    M

**DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR MUTILATIONS**

**05000-02-08-095**

...ge in connection with the transfer of ownership. Failure to complete or providing a false
... completing form. If title is in more than one name, all owners must sign as seller. Any
...he days of purchase, or pay a delinquent penalty. All liens shown on the face of this title
...to this to your local BMVC License Branch to complete your application for a new title.

## ...T BY REGISTERED DEALER ONLY

...tient that a false statement may constitute the crime of perjury.

| I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked | Name of purchaser |
| --- | --- |
| ☐ 1. The odometer reading stated is in excess of its mechanical limits. | Address |
| ☐ 2. The odometer reading is NOT actual mileage. WARNING - ODOMETER DISCREPANCY. | City ... State ... ZIP Code |
| Name of dealership | Name of lienholder |
| Signature | Address |
| Print name | City ... State ... ZIP code |
| Position ... Dealer number | I am aware of the above odometer certification made by the seller(s). |
| Date of sale (month, day, year) | Signature of purchaser ... Printed name of purchaser |

## SECOND RE-ASSIGNMENT BY REGISTERED DEALER ONLY

We swear or affirm that the information entered on this form is correct. We understand that a false statement may constitute the crime of perjury.

| I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked. | Name of purchaser |
| --- | --- |
| ☐ 1. The odometer reading stated is in excess of its mechanical limits. | Address |
| ☐ 2. The odometer reading is NOT actual mileage. WARNING - ODOMETER DISCREPANCY. | City ... State ... ZIP code |
| Name of dealership | Name of lienholder |
| Signature | Address |
| Printed name | City ... State ... ZIP code |
| Position ... Dealer number | I am aware of the above odometer certification made by the seller(s). |
| Date of sale (month, day, year) | Signature of purchaser ... Printed name of purchaser |

## THIRD RE-ASSIGNMENT BY REGISTERED DEALER ONLY

We swear or affirm that the information entered on this form is correct. We understand that a false statement may constitute the crime of perjury.

| I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked. | Name of purchaser |
| --- | --- |
| ☐ 1. The odometer reading stated is in excess of its mechanical limits. | Address |
| ☐ 2. The odometer reading is NOT actual mileage. WARNING - ODOMETER DISCREPANCY. | City ... State ... ZIP code |
| Name of dealership | Name of lienholder |
| Signature | Address |
| Printed name | City ... State ... ZIP code |
| Position ... Dealer number | I am aware of the above odometer certification made by the seller(s). |
| Date of sale (month, day, year) | Signature of purchaser ... Printed name of purchaser |

### NO ADDITIONAL RE-ASSIGNMENTS PERMITTED

08CV3186          LI

JUDGE  DARRAH

MAGISTRATE  JUDGE DENLOW

EDWARDS MOVERS, INC.
*CUSTOMER # 0606-0*

### COMBINED NOTE AND SECURITY AGREEMENT
### (CHATTEL MORTGAGE FORM FOR VEHICLES)

LOAN #14578
$27,900.00

MARCH 1, 2004
SOUTH EASTON, MA

FOR VALUE RECEIVED, the undersigned promises to pay to the order of Allied Van Lines, Inc. at its general offices in Westmont, Illinois the principal sum of Twenty Seven Thousand Nine Hundred and 00/100 dollars ($27,900.00) in lawful money of the United States of America in installments as follows: the sum of $664.00 on the 1ˢᵗ day of June, 2004 and a like and equal sum on the 1ˢᵗ day of each succeeding month for a total of 41 months and the sum of $676.00 on the 1ˢᵗ day of November, 2007, representing the final installment of principal, together with interest (computed on a monthly basis as described below) prior to maturity on the principal balance from time to time outstanding thereunder, payable on the aforesaid principal payment dates and at the maturity hereof (whereby acceleration or otherwise) at a fluctuating interest rate as shall be in effect from time to time, which rate per annum shall at all times be equal to 4.00 percent above the Prime Rate from time to time in effect. For the purpose of computing the monthly interest due the Prime Rate in effect on the date of this Combined Note and Security Agreement (Note) is the rate (plus add-on percentage) used to compute the interest due on the first payment date above. Thereafter, the Prime Rate in effect on the first and each subsequent payment date is the rate (plus add-on percentage) used to compute the interest due on the next succeeding payment date. The term Prime Rate shall mean the rate of interest from time to time announced by the Harris Trust and Savings Bank, Chicago, Illinois, as its prime commercial rate of interest.

On non-payment when due of any installment of principal or interest, all remaining installments at the option of the holder of this note shall become immediately due and payable without demand or notice of any kind. Interest on such past due installments of principal until paid shall be calculated at a rate per annum of 4.0 percent above the foregoing rate.

I/We shall have the untrammeled option to prepay any portion of the principal amount of this note at any time during the life of this loan without penalty, and without paying any unearned interest.

To secure the payment of this note, and any and all other obligations of whatever nature owed by the undersigned to Allied Van Lines, Inc., I/we hereby mortgage Allied Van Lines, Inc. and hereby grant to Allied Van Lines, Inc. a security interest in the following property and all accessories, parts and equipment now or hereafter affixed thereto or used in connection therewith (hereinafter called the "collateral"):

ONE (1) 2000 FREIGHTLINER STRAIGHT TRUCK
VIN # 1FVGHFBA51HH05088     AVL# 21350

1

to be principally garaged at 7 Lois Lane South Easton, MA, for use in its service during the life of this loan.

Until default (as herein defined) I/we may have the possession of the collateral and use the same in any lawful manner not inconsistent with the Note and Security Agreement or any policy of insurance on the collateral.

To induce Allied Van Lines, Inc. to enter into this agreement, I/we warrant and agree: (1) to the extent, if any, I/we have advised Allied Van Lines, Inc. that the collateral is being acquired with the proceeds of this note, such proceeds may be disbursed by Allied Van Lines, Inc. directly to the seller of the collateral; (2) I/we have, or forthwith will acquire, full title to the collateral, and will at all times keep the collateral free and clear of all liens and claims whatsoever, other than the security granted hereunder; (3) no financing statement nor chattel mortgage covering the collateral is on file in any public office, and I/we authorize Allied Van Lines, Inc. to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by the Secured Party describing the collateral in the same manner it is described herein; and, additionally, I/we will from time to time on request by Allied Van Lines, Inc. execute such financing statement and other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by Allied Van Lines, Inc. do such other acts and things, all as Allied Van Lines, Inc. may request to establish and maintain a valid security interest in the collateral (free and clear of all other liens and claims whatsoever) to secure the payment of my/our liabilities under this Note and Security Agreement; (4) I/we will not sell, transfer, lease or otherwise dispose of the collateral or interest therein except with the prior written consent of Allied Van Lines, Inc. or any subsequent holder of this Note and Security Agreement; (5) I/we will at all times keep the collateral in first class condition and repair, excepting any loss, damage or destruction which is fully covered by the process of physical damage insurance; (6) I/we will at all times keep the collateral insured against loss or damage from fire, theft and other risks, in such amounts and companies under such policies and in such form, all as shall be satisfactory to Allied Van Lines, Inc. which policies shall provide the loss thereunder shall be payable to Allied Van Lines, Inc. as its interests may appear; (7) Allied Van Lines, Inc. may examine and inspect the collateral or any part thereof, wherever located, at any reasonable time or times; (8) I/we will at all times pay or cause to be paid promptly when due all taxes and assessments upon collateral or imposed for the use of operation of the collateral; (9) I/we will submit financial statements as required by Rules and Regulations of Allied Van Lines, Inc.; (10) I/we will remain an agent in good standing of Allied Van Lines, Inc.; and (11) Debtor shall not disclose to any person or entity the terms and amount of this transaction or the existence thereof without the prior written consent of Allied.

At its option, Allied Van Lines, Inc. may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the collateral, may place and pay for insurance on the collateral, upon failure of me/us to provide insurance satisfactorily to Allied Van Lines, Inc. and may pay for the maintenance, repair and preservation of the collateral. I/we agree to reimburse Allied Van Lines, Inc. on demand for any payment made or any expense incurred by Allied Van Lines, Inc. pursuant to the foregoing authorization together with interest at 18% per annum. All such indebtedness shall be secured by the security interest granted to Allied Van Lines, Inc. in the collateral all as described herein.

2

The occurrence of any one or more of the following events shall constitute a default (as such term is used herein): (a) non-payment when due of any amount payable on any of the liabilities or failure to perform any agreement contained herein; (b) the insolvency or inability of me/us hereunder to pay my/our debts as they mature or the making of an assignment for the benefit of my/our creditors or any proceeding instituted against or by me/us alleging that I/we are insolvent or are unable to pay my/our debts as they mature or the filing of any petition seeking relief under any federal or state bankruptcy, insolvency, receivership or similar laws; or (c) any of the warranties set forth above shall be or become false at any time; or (d) any guaranty of any part or all of the indebtedness hereunder is ;impaired by my/our action or by operation of law or otherwise, or any such guarantor dies; or (e) a default under any indenture or instrument evidencing or relating to any of my/our indebtedness for borrowed money shall happen and be continuing; or (f) I/we became disaffiliated with Allied Van Lines, Inc.; or (g) Allied Van Lines, Inc. feels insecure for any other reason whatsoever; whenever a default shall be existing this Note and all other liabilities may, at the option of Allied Van Lines, Inc. and without demand or notice of any kind, be declared, and thereupon shall immediately become due and payable, and Allied Van Lines, Inc. may exercise from time to time any rights and remedies available to it under applicable law.

I/we agree, in case of default, to make the collateral available at a convenient place acceptable to Allied Van Lines, Inc. and to pay all costs incurred by Allied Van Lines, Inc. in the collection of this Note and all liabilities hereunder, and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses. Any proceeds of any disposition of the collateral may be applied by Allied Van Lines, Inc. to the payment of expenses in connection with the collateral, including reasonable attorney's fees and legal expenses, and any balance of such proceeds may be paid to me/us.

Upon such default Allied Van Lines, Inc. shall, in addition to the foregoing, have: (1) all the rights and remedies of a secured party of the Uniform Commercial Code of Illinois (regardless of whether said Code has been enacted in the jurisdiction where such right or remedies are asserted), including without limitation the right to take immediate and exclusive possession of the collateral, or any part thereof, and for that purpose may, with or without judicial process enter upon any premises on which the collateral may be situated and remove the same therefrom; (2) to remove any part or all of the collateral from its registered services; and (3) to offset from time to time and at any time, without limit and without any court proceeding or notice to me/us, any monetary obligation it owes me/us against any obligation of whatever nature owed by me/us to Allied Van Lines, Inc. The requirement of reasonable notice required by said Code shall conclusively be deemed to have been met if such notice is mailed, postage prepaid, to my/our address shown at the end of this Agreement at least five days before the time of the sale or disposition of the collateral. Allied Van Lines, Inc. may buy the collateral at any public or private sale thereof.

The remedies of Allied Van Lines, Inc. hereunder are cumulative and the exercise of any one or more of the remedies provided for herein, under said Code, or under other applicable law shall not be considered as a waiver of any of the other remedies of Allied Van Lines, Inc. No waiver by Allied Van Lines, Inc. of any default shall operate as a waiver of any other default or of the same default on a future occasion. All rights of Allied Van Lines, Inc. hereunder shall inure to the benefit of its successors and assigns, and all

3

my/our obligations shall bind my/our heirs, executors, administrators, successors, or assigns. If there be more than one Debtor hereunder all our obligations shall be joint and several.

To further secure payment hereof, I/we irrevocably authorize any attorney of any Court of Record to appear for me/us, in term time or vacation, at any time and from time to time after payment is due, whether by acceleration or otherwise, and confess judgment, without process, in favor of Allied Van Lines, Inc. against me/us for such amount as may be unpaid hereunder, together with the costs of such proceeding and attorney's fees of 15% of the amount unpaid hereunder, and waive and release all errors which may intervene in any such proceeding and consent to immediate execution upon said judgment, hereby ratifying and confirming all that my/our said attorney may do by virtue hereof.

All rights of Allied Van Lines, Inc. in, to and under this Agreement shall pass to and may be exercised by an assignee of Allied Van Lines, Inc. I/we agree that my/our liability to such assignee shall be immediate and absolute, and that I/we will not set up any claim against Allied Van Lines, Inc. as a defense counterclaim or set-off to any action brought by any such assignee for the unpaid balance owed hereunder.

This Note and Security Agreement shall be deemed to have been delivered by both the Debtor and Secured Party at Naperville, Illinois (site of the General Offices of Allied Van Lines, Inc.), and shall be governed by the laws of the State of Illinois, to the optimum possible extent, for the sake and purpose of achieving uniformity in terms and conditions on loans made by Allied Van Lines, Inc. to its borrowing agents.

This loan will become effective and interest begins accruing on May 1, 2004, or on the date the loan proceeds are released and the equipment is picked up.

This Note and Security Agreement has been duly executed on the date at the place first above-mentioned.


ALLIED VAN LINES, INC.                    EDWARDS MOVERS, INC.
Secured Party                             Debtor

By: _____            By: _____
    (Authorized Signature)                   (Authorized Signature)


**ADDRESS OF SECURED PARTY**              **ADDRESS OF DEBTOR:**

700 Oakmont Lane                          7 Lois Lane
Westmont, IL 60559                        South Easton, MA 02375


4

# MINUTES OF SPECIAL MEETING

A Special Meeting of the Board of Directors of __EDWARDS MOVERS, INC.__ __#0606-0__ of South Easton, Massachusetts and was held on the __1st__ day of __March__, 20 __04__ pursuant to written waivers of notice duly executed by all the Directors of the corporation.

A quorum of the Directors of the corporation was present, in accordance with the Articles of Incorporation and Bylaws of the corporation.

The Chairman called the meeting to order. Upon motion duly made, seconded and carried, the following Resolution was adopted:

RESOLVED, that the President of the Corporation, or any Vice President thereof in his place and stead, is hereby authorized to borrow on **Loan #14578** from **Allied Van Lines, Inc.** of Westmont, Illinois, pursuant to all of the terms and conditions of its standard Equipment Loan Plan for its hauling agents, the within stated amount of money to finance the purchase of the following described vehicle(s) for full-time use in Allied's service for the within stated period of time, and at the within stated rate of simple interest on the principal sum remaining from time to time unpaid; to execute Allied's standard Combined Note and Security agreement under the Uniform Commercial Code of Illinois evidencing Allied's loan terms and its first lien and security interest in the said vehicle(s); and to execute any and all documents necessary, in the sole judgment of Allied, to effectuate the above stated purposes.

1.    **LOAN TERMS**

Amount: $ 27,900.00

Number of Monthly Installments:  42
Amount of Monthly Installments:  $664.00 x 41 + $676.00 x 1 + Interest

Rate of Interest: A variable rate of 4.0% over prime per annum
Due Dates-Interest and Principal: From 6-1-04 to 11-1-07

2.    **DESCRIPTION**

ONE (1) 2004 FREIGHTLINER STRAIGHT TRUCK
VIN #  1FVGHFBA51HH05088        AVL 21350

_Wayne Edwards_
Chairman of the Meeting

I hereby certify that the above and foregoing is a true and correct copy of the Resolution adopted by EDWARDS MOVERS, INC. by its Board of Directors, at the special Meeting called for this purpose on the 1st day of __march__, 20 __04__ at 7 Lois Ln Easton, ma.

Secretary of the Meeting

# CERTIFICATE OF TITLE

## THE COMMONWEALTH OF MASSACHUSETTS

| TITLE NUMBER | VEHICLE IDENTIFICATION NUMBER | DATE OF ISSUE |
|---|---|---|
| BA411674 | 1FV6HFBA51HH05088 | 05/28/2004 |

| MFRS. MODEL YEAR | MAKE | MODEL NAME | MODEL NO. | BODY STYLE/TYPE | NEW/USED |
|---|---|---|---|---|---|
| 2001 | FRHT | MEDCON | FL70 | TRUCK | USED |

| CYL. PASS. DRS. | PURCHASE DATE | ODOMETER READING | PREV. TITLE NO. | PREV. TITLE STATE |
|---|---|---|---|---|
| 06 03 2 | 04/08/2004 | 236,000 ACTUAL MILEAGE | 03204216054 | IN |

MAILING ADDRESS ONLY:
ALLIED VAN LINES
5001 US HWY 30W
FT WAYNE, IN 46818

### TITLE TYPE AND BRANDS

TITLE TYPE

BRAND
BRAND
BRAND
BRAND

TITLE MESSAGES

OWNER(S) NAME AND ADDRESS
EDWARDS MOVERS, INC
7 LOIS LN
E EASTON, MA 02375

FIRST LIENHOLDER
ALLIED VAN LINES
5001 US HWY 30W
FT WAYNE, IN 46818

RELEASE OF FIRST LIEN:

AUTHORIZED SIGNATURE
X

DATE RELEASED

RELEASE OF SECOND LIEN:

AUTHORIZED SIGNATURE
X

DATE RELEASED

Kimberly Hinden

THIS TITLE CONTAINS A WATERMARK

HOLD TO LIGHT TO VIEW EAGLE WATERMARK

VOID

ALTERATION OR ERASURE VOIDS THIS TITLE.    KEEP IN SAFE PLACE



**WARNING:** Federal and Massachusetts laws require that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

**ANY ERASURES, WHITE-OUTS OR CROSS-OUTS WILL VOID THE ASSIGNMENT AND ALL ASSIGNMENTS THAT FOLLOW**

## ASSIGNMENT OF CERTIFICATE OF TITLE BY OWNER

THIS IS TO BE COMPLETED BY THE SELLER and delivered to the Purchaser with the vehicle. If a non-dealer sale, purchaser must have application for a new Certificate of Title on MA form RMV-1, and file it immediately with the Massachusetts RMV and surrender the assigned Title.

I/we hereby assign, transfer, and convey the motor vehicle described on the reverse side of this certificate, for the sale price herein stated, to the following named purchaser, and I/we hereby warrant the Title to said motor vehicle and that it carries free of all liens and encumbrances.

SALE PRICE $                    PRINT NAME OF PURCHASER                    DATE OF SALE

STREET                    CITY                    STATE                    ZIP

**ODOMETER DISCLOSURE STATEMENT    CAUTION: ONLY CHECK A BOX IF THE ODOMETER READING DIFFERS FROM ACTUAL MILEAGE**

I certify to the best of my knowledge the odometer reading specified here is the actual mileage of the vehicle, unless one of the following statements is checked:

1. I hereby certify to the best of my knowledge the odometer reading stated is in excess of its mechanical limits. (The odometer started at zero again.)

2. I hereby state the odometer reading is not the actual mileage. **WARNING - ODOMETER DISCREPANCY**

SIGNATURE OF SELLER(S)                    PRINTED NAME(S) OF SELLER(S)

PURCHASER(S): DO NOT SIGN BELOW UNTIL ALL SECTIONS ABOVE HAVE BEEN COMPLETED. YOUR SIGNATURE BELOW INDICATES YOU ARE AWARE OF THE ODOMETER DISCLOSURE STATEMENT MADE BY THE SELLER

SIGNATURE(S) OF PURCHASER(S)                    PRINTED NAME(S) OF PURCHASER(S)                    DATE

## 1st RE-ASSIGNMENT BY LICENSED DEALER ONLY

The undersigned licensed Dealer hereby certifies that the Title to the motor vehicle described on the face of this Certificate of Title was transferred to:

PRINT NAME OF PURCHASER(S)                    PRINT ADDRESS

SIGNATURE(S) OF PURCHASER(S)                    PRINTED NAME(S) OF PURCHASER(S)                    DATE

**ODOMETER DISCLOSURE STATEMENT    CAUTION: ONLY CHECK A BOX IF THE ODOMETER READING DIFFERS FROM ACTUAL MILEAGE**

I certify to the best of my knowledge the odometer reading specified here is the actual mileage of the vehicle, unless one of the following statements is checked:

1. I hereby certify to the best of my knowledge the odometer reading stated is in excess of its mechanical limits. (The odometer started at zero again.)

2. I hereby state the odometer reading is not the actual mileage. **WARNING - ODOMETER DISCREPANCY**

DEALER'S LICENSE NUMBER                    DEALERSHIP NAME AND ADDRESS

SIGNATURE OF LICENSED DEALER                    PRINT NAME                    DATE

## 2nd RE-ASSIGNMENT BY LICENSED DEALER ONLY

The undersigned licensed Dealer hereby certifies that the Title to the motor vehicle described on the face of this Certificate of Title was transferred to:

PRINT NAME OF PURCHASER(S)                    PRINT ADDRESS

SIGNATURE(S) OF PURCHASER(S)                    PRINTED NAME(S) OF PURCHASER(S)                    DATE

**ODOMETER DISCLOSURE STATEMENT    CAUTION: ONLY CHECK A BOX IF THE ODOMETER READING DIFFERS FROM ACTUAL MILEAGE**

I certify to the best of my knowledge the odometer reading specified here is the actual mileage of the vehicle, unless one of the following statements is checked:

1. I hereby certify to the best of my knowledge the odometer reading stated is in excess of its mechanical limits. (The odometer started at zero again.)

2. I hereby state the odometer reading is not the actual mileage. **WARNING - ODOMETER DISCREPANCY**

DEALER'S LICENSE NUMBER                    DEALERSHIP NAME AND ADDRESS

SIGNATURE OF LICENSED DEALER                    PRINT NAME                    DATE

## 3rd RE-ASSIGNMENT BY LICENSED DEALER ONLY

The undersigned licensed Dealer hereby certifies that the Title to the motor vehicle described on the face of this Certificate of Title was transferred to:

PRINT NAME OF PURCHASER(S)                    PRINT ADDRESS

SIGNATURE(S) OF PURCHASER(S)                    PRINTED NAME(S) OF PURCHASER(S)                    DATE

**ODOMETER DISCLOSURE STATEMENT    CAUTION: ONLY CHECK A BOX IF THE ODOMETER READING DIFFERS FROM ACTUAL MILEAGE**

I certify to the best of my knowledge the odometer reading specified here is the actual mileage of the vehicle, unless one of the following statements is checked:

1. I hereby certify to the best of my knowledge the odometer reading stated is in excess of its mechanical limits. (The odometer started at zero again.)

2. I hereby state the odometer reading is not the actual mileage. **WARNING - ODOMETER DISCREPANCY**

DEALER'S LICENSE NUMBER                    DEALERSHIP NAME AND ADDRESS

SIGNATURE OF LICENSED DEALER                    PRINT NAME                    DATE

08CV3186        LI
JUDGE   DARRAH
MAGISTRATE   JUDGE DENLOW

# *ALLIED*®

## AGENCY CONTRACT

AGREEMENT by and between ALLIED VAN LINES, INC., a Delaware corporation, hereinafter referred to as CARRIER, and the agent identified below, hereinafter referred to as AGENT.

The parties hereto have read, understand and have agreed to the terms of this contract.

IN TESTIMONY WHEREOF, each of the parties has caused this contract to be executed by a duly authorized representative thereof to be effective as of the date(s) specified below.

Initial Term: May 1, 2005 to April 30, 2008.

| CARRIER | AGENT |
|---|---|
| **Allied Van Lines, Inc.** | **Edwards Movers Inc.** |
| 700 Oakmont Lane | 7 Lois Lane |
| Westmont, IL 60558 | S. Easton, MA 02375 |

By _Terri Shuw_

Title _V.P. +G.M._

Date _6-24-05_

By _Wayne Edwards_

Title _President_

Date _5/24/05_

AGENT is a _Corporation_
(corporation, limited liability company,
partnership,
proprietorship) organized under
the laws of the State
of _MA_

# TABLE OF CONTENTS

**PAGE**

## Section 1

| | | |
|---|---|---|
| 1.1 | Appointment of AGENT | 5 |
| 1.2 | Carriage of Shipments | 5 |
| 1.3 | Insurance | 5 |
| 1.4 | Expense Ratio | 5 |
| 1.5 | Cost-related Surcharges | 5 |
| 1.6 | Marketing Charge | 6 |
| 1.7 | BI/PD Fund | 6 |
| 1.8 | Cargo Claims Chargebacks | 7 |
| 1.9 | Computer Connection | 8 |
| 1.10 | Self-Haul Policy | 8 |
| 1.11 | Invoicing Fees | 8 |
| 1.12 | Repositioning Fund | 8 |
| 1.13 | Lease of Equipment | 9 |
| 1.14 | Use of Agent Equipment and Facilities | 9 |
| | (a) First and Second Proviso | 9 |
| | (b) Third Proviso (Special Products) | 9 |
| 1.15 | (A) CARRIER Bookings | 10 |
| | (B) Recruiting Programs | 10 |
| 1.16 | CARRIER Ownership of Agents | 10 |
| 1.17 | Assignment of Shipments | 11 |
| 1.18 | Treatment of Agents | 11 |
| 1.19 | Hauling Incentive | 11 |
| 1.20 | Designation of Origin and Destination Agents | 12 |
| 1.21 | Provision of Services | 12 |
| 1.22 | COD Payments | 12 |
| 1.23 | Military Shipments | 12 |
| 1.24 | Agent Fund Review | 12 |

## Section 2

| | | |
|---|---|---|
| 2.1 | Duties | 12 |
| 2.2 | Provision of Services | 12 |
| 2.3 | Performance Measurements | 13 |
| 2.4 | Rules and Regulations | 14 |
| 2.5 | Agent Authority Policy | 14 |
| 2.6 | Required Self-Haul | 14 |
| 2.7 | Lease of Equipment | 14 |
| 2.8 | Records and Reports | 14 |
| 2.9 | Services Not Subject to Agency Contract | 14 |
| 2.10 | Locations | 14 |

3

**PAGE**

### Section 3

| | | |
|---|---|---|
| 3.1 | Allocation of Liability | 14 |
| 3.2 | Billing of Customers | 15 |
| 3.3 | Allocation of Revenue | 15 |
| 3.4 | (A) Rules and Regulations | 15 |
| | (B) Rules of Engagement | 16 |
| | (C) Sales Leads; Graphics | 16 |
| 3.5 | Limited Relationship | 16 |
| 3.6 | Service of Process | 16 |
| 3.7 | Independent Relationship | 16 |
| 3.8 | (A) Trademarks | 16 |
| | (B) Registration of Shipments | 17 |
| | (C) Termination of Trademark Use | 18 |
| 3.9 | Laws and Regulations | 18 |
| 3.10 | International; Relocation Companies | 18 |
| | (A) International | 18 |
| | (B) CARRIER's Affiliated Relocation Companies | 18 |
| | (1) Continuation of AGENT Relationship with Customer | 18 |
| | (2) Relocation Brokerage Fees | 19 |
| | (3) AGENT Service to RSC | 19 |
| | (4) Relocation Referral Commissions | 19 |
| | (5) Relocation Volume Commitment | 20 |
| 3.11 | Term and Termination | 21 |
| 3.12 | Termination for Multiple Breaches | 21 |
| 3.13 | Arbitration | 21 |
| 3.14 | Transfer | 22 |
| 3.15 | No Third Party Beneficiaries | 23 |
| 3.16 | Waiver | 23 |
| 3.17 | Severability | 23 |
| 3.18 | Governing Law | 23 |
| 3.19 | Amendments | 23 |
| 3.20 | Effective Date; Integration | 23 |
| 3.21 | Locations | 23 |

### EXHIBITS TO AGENCY CONTRACT

| | |
|---|---|
| Exhibit 1.4 – Expense Ratio | 24 |
| Exhibit 1.6 – Marketing Revenue | 29 |
| Exhibit 2.5 – Agent Authority Policy | 30 |
| Exhibit 3.4 – Rules of Engagement | 32 |

4

WHEREAS CARRIER desires to appoint AGENT as its limited agent with the specific powers set forth herein to represent CARRIER, and no other powers or rights to obligate, bind, or represent CARRIER, and WHEREAS AGENT desires to accept such appointment; NOW THEREFORE, CARRIER and AGENT, in consideration of the mutual covenants contained herein, agree as follows:

1.  CARRIER for the term hereof, covenants:

1.1 Appointment of AGENT. To constitute and appoint AGENT, as CARRIER's agent to solicit, to estimate the weight, size and charges of, to collect charges for, to book, register, pack, crate, prepare for transportation, receive, load, transfer, unload, store, warehouse, deliver, and otherwise to service, in accordance with the terms applicable thereto, shipments of commodities which CARRIER has authority to transport, and from time to time, as directed or authorized by CARRIER to provide equipment, to bill for services and transport such shipments.

1.2 Carriage of Shipments. To bill and carry, or cause to be carried, all shipments so booked and registered by AGENT pursuant to CARRIER's reasonable rules and regulations.

1.3 Insurance. To insure against, or cause to be insured, any and all liability of AGENT, for loss or damage to any shipment booked or hauled by AGENT for CARRIER within the scope of this agency appointment, by such insurance companies, or by self-insurance, and in such amounts and under such terms and conditions as shall be consonant with then existing governmental regulations.

1.4 Expense Ratio. To compensate AGENT for all services performed pursuant hereto in accordance with CARRIER's compensation schedules as in effect from time to time, except that the percentage of transportation revenue retained by CARRIER as its "expense ratio" shall not exceed the applicable expense ratio as defined and set forth in Exhibit 1.4 hereto. No expense ratio will be applied to accessorial services or surcharges passed through directly to AGENT.

1.5 Cost-related Surcharges. To pass through cost-related surcharges to the party which incurs the cost, without application of the expense ratio. If cost-related surcharges are folded into the regular transportation rate, the amount folded in shall continue to be excluded from the transportation revenues against which the expense ratio applies in consultation with and pursuant to agreement of a Committee. For purposes of this Contract a "Committee" means a committee designated by CARRIER and the Board of the Allied Agents Association ("Board")or other mutually acceptable representative of AGENT and CARRIER's other agents. Decisions by Committee members designated by the Board require approval of the Board.

The Seasonal Rate Adjustment shall continue to be treated as an addition to revenue, subject to the applicable expense ratio where it is applied to increase revenue which is itself subject to such expense ratio.

1.6   <u>Marketing Charge</u>. To collect, from the types of shipments listed on Exhibit 1.6 hereto, 0.35 % of the transportation revenue (reduced from 1.0% of such revenue) for marketing activities. CARRIER as soon as practicable will reduce to 0.35% the amount collected at the time shipments are processed, and CARRIER will promptly credit AGENT any amounts in excess of that percentage which are collected from shipments loaded after this Contract becomes effective. CARRIER will match the first $800,000 collected from AGENT and CARRIER's other agents in each calendar year. Expenditures from these funds shall be made in consultation with and pursuant to agreement of a Committee.

1.7   <u>BI/PD Fund</u>.

(A) To operate, on a substantially break-even basis, CARRIER's "Bodily Injury and Property Damage Fund" ("BI/PD Fund") maintained pursuant to CARRIER's current Rule 9, with charges and fees determined, and annual chargebacks for recovery of deficits and annual distributions of surpluses made, at the time and by the methods provided in CARRIER's reasonable rules and regulations and in accordance with paragraph (B) below. The BI/PD Fund may be reduced or eliminated in the sole discretion of CARRIER so long as there is a proportional reduction in the amount of revenues retained for such Fund.

(B) The administrative costs of CARRIER, other than costs of insurance premiums and of administration of claims, to be charged against and payable out of such Fund shall be limited to costs incurred by CARRIER for Safety, Classroom Training, Fleet Registration, Driver Qualification, and Insurance Compliance/Accident Reporting. The total amount of such costs for the BI/PD Fund will not exceed $1.81 Million in calendar year 2005, and CARRIER will absorb any increase in such costs thereafter which exceeds the Inflation Rate as defined in Exhibit 1.4, adjusted for changes in shipment volume, provided that such costs can be further increased in consultation with and pursuant to agreement of a Committee. AGENT and other agents of CARRIER will not in the aggregate be allocated a greater part of these charges than the proportion of CARRIER's revenue from which BI/PD Fund contributions are derived bears to the total amount of revenue from which BI/PD Fund contributions are derived. In addition:

(i) CARRIER will contribute to the BI/PD Fund for AGENT and CARRIER's other agents the amount of $250,000 for each calendar year including calendar year 2005.

(ii) CARRIER will at the end of each quarter contribute to the Fund an amount equal to "interest," calculated at the rate for 90-day U.S. Treasury bills, on the excess of the collected cash balance of the Fund over the collected cash balance of the Fund on February 9, 1988.

(iii) $450,000 of insurance premium costs charged to the BI/PD Fund in 2004 will beginning in 2005 be paid by other means, thereby reducing the overall cost to the BI/PD Fund by $450,000 per year. This reduction will benefit AGENT and CARRIER's other agents in proportion to the amount of CARRIER's revenue from which BI/PD Fund contributions are derived in relation to the total amount of revenue from which BI/PD Fund contributions are derived.

(iv) The BI/PD Fund will not be charged for insurance premiums for liability levels above $ 35 million per occurrence.

6

(C) During 2005, CARRIER will establish a group consisting of representatives of all contributors to the Fund including agents of CARRIER and affiliated van lines, CARRIER's affiliate Transguard Insurance Company of America, Inc., and external insurance experts, to consider the way in which CARRIER and its affiliates deal with shared risk, with a goal of significantly reducing the cost of liability coverage for all participants. Notwithstanding the foregoing, AGENT may itself or with a group of agents propose to CARRIER an insurance program for all CARRIER's agents with an insurance company rated no less than A- by A.M. Best that will (a) fulfill all of CARRIER'S liability and property damage insurance obligations under federal law, (b) name CARRIER as an insured and (c) indemnify CARRIER with the same coverage presently furnished by the BI/PD Fund, up to Thirty-Five Million Dollars ($35,000,000.00) , and (d) does not adversely affect the other participants in the Fund. CARRIER will consider the sufficiency of such proposal, and will within 90 days of receiving such proposal advise AGENT whether it will be adopted. If CARRIER and AGENT are unable to agree within that time or if CARRIER sooner notifies AGENT that the proposal is not sufficient, AGENT may within 30 days of receiving such notice, or if later within 30 days after the end of the 90-day period, commence arbitration under the procedures set forth in paragraph 3.14 of this Contract (other than subparagraphs (c) and (g)) by giving notice thereof to CARRIER.  The arbitrator will determine whether the proposal meets the requirements of clauses (a), (b) and (c) of this Section 1.7 (C).

1.8     Cargo Claims Chargebacks.

(A) To continue CARRIER's Experience-Rated Cargo Claims Chargeback Program substantially as it exists on the date hereof,  on a substantially break-even basis as to CARRIER's base legal liability, subject to CARRIER's continuing right to make reasonable changes in such program as long as such changes do not alter the break-even basis on which the program is operated.  In the event that the currently applicable $.60 per pound base liability is changed, CARRIER will revise the program to maintain, as closely as possible, the existing division of revenue and cost between CARRIER, AGENT and CARRIER's other agents, taking into account the increase in cargo claim liability and any attendant tariff changes in connection with the change in base liability.

(B)  To refund to AGENT and CARRIER's other agents, after the close of each one-year period ending September 30 (each such period a "Valuation Year"), one-half of the amount by which Net Valuation Revenue (as defined below) for such Valuation Year exceeds the Threshold Amount. For this purpose:

(i)     "Net Valuation Revenue" means the excess of "Valuation Revenue" plus "agent chargebacks" over all "claims costs" plus "administrative expenses."

(ii)    "Valuation Revenue" means all sums collected by CARRIER in respect of the valuation of its liability for loss or damage to cargo, and revenue distributed to CARRIER in lieu of such sums.

(iii) "Agent chargebacks" means the aggregate amount collected through chargebacks to AGENT and CARRIER's other agents pursuant to paragraph (A) above.

(iv) "Claims costs" means moneys paid or payable by CARRIER in connection with claims for loss or damage to shipments transported by CARRIER, and all costs and expenses, including attorney's fees, investigative expenses and other costs, relating to such claims.

(v) "Administrative expenses" will be charged at a rate of $250 per original claim file opened. In the event that, in the opinion of CARRIER in consultation with and pursuant to agreement of a Committee, the frequency of CARRIER's claims substantially increases in any one year over the prior year, CARRIER and that Committee will reevaluate the amount of the charge.

(vi) "Threshold Amount" means: (a) for the Valuation Year ending in 2005, $6,400,000; (b) for the Valuation Year ending in 2006, $6,200,000; (c) for Valuation Years ending in 2007 and thereafter, $6,000,000.

The mechanism for determining AGENT's share of refunds under this paragraph (B) shall be as set forth in CARRIER's rules and regulations which for this purpose will be established in consultation with and pursuant to agreement of a Committee.

1.9     Computer Connection. If AGENT is presently subscribing to CARRIER's computer system, to provide such services to AGENT at a charge in the aggregate no greater than CARRIER's cost.   For this purpose, CARRIER's cost includes direct telecommunications expenses, a pro rata portion of its mainframe computer lease and maintenance expense and Information Systems administrative support, specialized equipment and software, a portion of communications support costs, and other net expenses, but excludes any general corporate cost allocations.   AGENT agrees that it will subscribe to and thereafter continue to maintain appropriate connections with CARRIER's computer system for each approved location.

1.10    Self-Haul Policy. To maintain in effect the terms and provisions of CARRIER's present Household Goods Self-Haul Policy, except that the operational requirements and request process shall be subject to reasonable modifications by CARRIER.   However, if CARRIER institutes operations utilizing non-agent vehicles other than during May 15 to September 30 pursuant to consent obtained under paragraph 1. 14, the operational requirements and request process in effect on the date of this agreement shall not be altered nor modified.

1.11    Invoicing Fees. To charge a fee no greater than 1.50% for first and second proviso shipments and 1.35% for third proviso shipments of the invoiced amount as CARRIER's fee for billing services performed under its Complete Billing System, provided that CARRIER may establish a program under which, based on the quality of the customer, the credit terms of the shipment, and the work required for invoicing, the stated percentages may be increased or decreased by up to one-half percentage point (1/2 %) so long as CARRIER does not collect from AGENT and CARRIER's other agents an aggregate percentage greater than the percentage it would have been entitled to collect in the absence of such program.

1.12    Repositioning Fund. As CARRIER deems necessary and appropriate to compensate agents for the repositioning of unloaded or light-loaded vehicles, from time to time to maintain a fund (which shall have a reasonable balance appropriate for the size and purposes of such fund)

derived from hauling compensation otherwise due AGENT in accordance with CARRIER's reasonable rules and regulations. All amounts collected pursuant to this provision will be used exclusively for payments to haulers to accomplish such repositioning.

1.13    Lease of Equipment. To lease under CARRIER's standard form Equipment Lease Agreement any and all automotive vehicles fully meeting CARRIER's then current equipment specifications, which AGENT may from time to time tender in response to CARRIER's equipment needs.

1.14    Use of Agent Equipment and Facilities. Except as otherwise provided herein or required by law or order of competent authority, CARRIER, in transporting household goods by motor vehicle as a motor carrier between points within the contiguous United States and between points in the contiguous United States on the one hand, and on the other, points in Canada, shall:

(a) utilize exclusively the equipment and facilities of AGENT and CARRIER's other agents in conducting that portion of its business which consists of transporting or arranging transportation of first and second proviso household goods other than containerized military goods; provided, however, that during the peak season (May 15 to September 30) of any year, CARRIER may utilize other equipment and facilities if it determines for that year that AGENT and its other agents have not committed to CARRIER the equipment and facilities necessary to meet CARRIER's anticipated needs for that peak season, without thereby relieving AGENT of its obligations under paragraph 2.6 hereof; and

(b) utilize the equipment and facilities of AGENT and CARRIER's other agents in conducting that portion of its business which consists of transporting or arranging transportation of third proviso household goods unless CARRIER determines that its agent(s) is (are) unable or unwilling to provide the equipment or facilities necessary to be responsive to market needs or competitive pressures.

In the event of circumstances not presently contemplated, CARRIER may modify, temporarily suspend, or terminate the limitations set forth in clause (a) above. However, such action must first be approved by the affirmative vote of the agents of CARRIER which at the time hold Agency Contracts pursuant to the general contract offer which included this Contract. For this purpose, each eligible agent shall have one vote for each dollar of first proviso transportation revenue derived from shipments it hauled during the full calendar year next preceding such vote. Approval shall be granted upon the affirmative vote of a majority of the eligible votes. In addition CARRIER may, in consultation with and pursuant to agreement of a Committee, develop a small shipment program which uses agent and non-agent equipment and facilities as appropriate for the conduct of that business.

CARRIER will during the term of this Contract  continue to provide agents with appropriate and suitable services for the effective operation of its business which consists of transporting or arranging transportation of third proviso household goods. CARRIER will, in consultation with and pursuant to agreement of a Committee, develop an incentive program for AGENT and CARRIER's other agents to earn back the 1/2% third proviso business infrastructure contribution though sales growth.

9

The terms "household goods," "motor carrier," and "motor vehicle" are defined as set forth in Title 49 of the United States Code as in effect on October 1, 1991. The terms "first proviso," "second proviso," and "third proviso" mean Subsections (A), (B), and (C), respectively, of Section 10102(1 1) of said Title as in effect on that date.

1.15    (A) <u>CARRIER Bookings</u>. During the term of this contract CARRIER agrees not to book directly first, second and third proviso shipments from national account customers from which AGENT during the preceding twelve months has either (i) booked at least $100,000 in linehaul revenues, or (ii) booked, alone or together with other agents of CARRIER, at least one-third of such national account's available linehaul revenue. CARRIER also agrees that it will consult with AGENT before directly booking national account business if AGENT has in the preceding twelve months booked or to CARRIER's knowledge attempted to book business from such account. CARRIER may retain such part of the booking commission, up to one-half, as is agreed upon between CARRIER and AGENT (if it is the booker) or the other agent of CARRIER acting as booker. In such cases, the remainder of the booking commission shall be distributed, according to CARRIER's reasonable rules and regulations, among AGENT and other agents of CARRIER who provide booking and other services on shipments with such accounts.

(B)    <u>Recruiting Programs</u>. CARRIER is required to consult with AGENT on building market share before beginning a recruiting program in a Market Area within which AGENT operates a full-service facility if CARRIER's share of the total first, second and third proviso commercial ("account" and "COD"), military, and government actual transportation revenue booked by agents in such Market Area exceeds twenty (20%) percent. Market Area as used herein is defined as any Metropolitan Statistical Area (MSA) used by the Household Goods Carriers' Bureau Committee of the American Movers Conference, plus the addition of twenty-five (25) miles from the MSA's outer boundaries. However, CARRIER is not required to consult with AGENT if AGENT is in violation of this contract or significant rules and regulations hereunder.

1.16    <u>CARRIER Ownership of Agents</u>. Notwithstanding paragraphs 1.14 and 1.15 above, CARRIER may, in order to protect the agent system against the financial, operating and marketing harm that arises out of agent failures, or to avoid acquisition of an agent by a competitive carrier, with the consent of the agent in question or pursuant to prior agreement with such agent, acquire agents or otherwise operate facilities and equipment using the assets of agents in imminent danger of financial failure or which have notified CARRIER that they have been offered for sale to a competitive van line or agent of a competitive van line.    If CARRIER so acquires or operates a facility it will transfer ownership and/or operation thereof, along with any related equipment, to a new or existing agent at the earliest practical date upon commercially reasonable terms. If CARRIER is unable to do so within eighteen months after such acquisition is made or such operation begins, CARRIER shall offer to sell such business to one or more agents of CARRIER, or to representatives of agents, at fair market value as established by a reasonable commercial appraisal of the value of such business. If such offer is not accepted, CARRIER may continue to operate such facility but only for an additional eighteen months after which, if it has not been sold, it must be closed. In no event shall this paragraph be construed as granting CARRIER the authority to acquire or operate AGENT or any other particular agent; any such authorization must be granted separately from this contract. Market share obtained through

10

operations or facilities under this paragraph will be included in CARRIER's market share for purposes of paragraph 1.15(B).

1.17    Assignment of Shipments. With respect to hauls other than those which AGENT is required to service pursuant to paragraph 2.6 below, to assign, distribute and route equipment and shipments therein upon a basis which will reduce empty and light-loaded van mileage of the system to the extent operationally feasible, and at the same time provide for the safe, expeditious and adequate transportation of shipments in a fair and reasonable manner, all without regard to whether shipments were booked by CARRIER or by its agents.

1.18    Treatment of Agents. Conditions otherwise being equal, CARRIER shall, to the fullest extent practicable and in compliance with all applicable laws, refrain from unfairly preferring one agent over another agent; provided that CARRIER may, subject to the maximum limits set forth in paragraph 1.4 above, establish a sliding scale of expense ratios and other charges based upon the volume of agent booking revenues, quality of performance, growth, financial stability, and any other factors it deems appropriate.

1.19    Hauling Incentive.

(a)  CARRIER will pay up to Five Thousand Dollars ($5,000.00) for each truck by which AGENT has increased its number of trucks in CARRIER's conventional fleet from May 15 through September 15 in any year over the number in such fleet from the same period in the prior year. However, CARRIER will not be required to pay a total of more than Five Hundred Thousand Dollars ($500,000.00) in any one year to AGENT and CARRIER's other agents under this program and if an amount greater than that is called for, the amount per truck will be pro-rated among CARRIER's agents, including if applicable AGENT, who are entitled to receive it.

(b)  In addition, if the total number of trucks in CARRIER's conventional fleet furnished by all CARRIER's agents increases by ten percent or more from May 15 through September 15 in any year over the number in such fleet from the same period in the prior year, CARRIER will pay up to an additional $5,000 for each truck by which AGENT has increased the number of trucks in such fleet, and the maximum aggregate payment by CARRIER to AGENT and CARRIER's other agents under this program for purposes of the pro-ration described in paragraph (a) will be increased to $1,000,000.

(c)  Equipment which was acquired through recruitment or hiring from another agent of CARRIER or of another van line under common control with CARRIER will not be included in the number of trucks furnished by AGENT for purposes of paragraphs (a) and (b) above.

(d)  "AGENT" for the purpose of Sections (a) through (c) above means all CARRIER agents controlling, controlled by, or under common control with AGENT.

(e)  CARRIER shall prescribe, by reasonable rule or regulation, terms and conditions for determining the number of trucks furnished by AGENT and CARRIER's other agents for purposes of paragraphs (a) and (b) above, including Short Haul and Substitute Service.

11

1.20    Designation of Origin and Destination Agents. CARRIER grants AGENT, subject to paragraph 2.2(f) hereof, the right to designate, at the time of the original booking of a shipment by AGENT with CARRIER, the origin agent and the destination agent for such shipment.

1.21    Provision of Services. To provide agents of CARRIER with appropriate and suitable services for the effective operation of the business to which this contract relates, provided that during the term of this contract CARRIER does not reduce service to its agent system in a manner that materially reduces the aggregate economic value of such services to the agent system.

1.22    COD Payments. CARRIER agrees that it shall not implement any change in the manner of collecting and crediting COD payments.

1.23    Military Shipments. CARRIER will return, pursuant to a program to be developed in consultation with and pursuant to agreement of a Committee, a program to return to AGENT and CARRIER's other agents a total of $400,000 per Measurement Period (as defined in Exhibit 1.4) based on expense ratio retained by CARRIER pursuant to Section 1.4 from military shipments booked by AGENT with CARRIER, or with military freight forwarders or military motor carriers owned by CARRIER.

1.24    Agent Fund Review.  All funds that are maintained by CARRIER that require contributions by AGENT and other CARRIER agents will be reviewed by CARRIER and a Committee on a quarterly basis.  CARRIER will prepare and submit each quarter a report on the financial status of each fund.


2.  AGENT, for the term hereof, covenants:

2.1    Duties. To perform and discharge loyally, diligently and efficiently, all of the duties and responsibilities of such agency appointment in strict compliance with CARRIER's reasonable rules and regulations, as well as with all laws, orders and regulations of competent governmental authority, and, recognizing its responsibilities as part of a nation-wide system of household goods moving agents, to conduct its business in accordance with the highest standards of honesty, integrity, fair dealing, and ethical conduct, and to do nothing which would tend to discredit, dishonor, reflect adversely upon, or in any manner injure the reputation of CARRIER, AGENT, or any other agent of CARRIER.

2.2    Provision of Services. In furtherance thereof, to provide the following facilities and services in accordance with, at the least, the minimum standards of performance, customer satisfaction, and quality as may be reasonably prescribed from time to time by CARRIER:

(a) Booking service, consisting of advertising, sales promotion, soliciting and contacting prospective shippers of household goods, obtaining executed orders for service, communicating appropriately and timely information to customers and shippers, settling or assisting in investigation and settlement of claims, and collecting undercharges where they are payable by persons located at the point where shipment is booked;

(b) Origin terminal service, consisting of inspection and inventory of the articles to be moved, accurate estimate of number, kind, cubic feet, weight and charges for

transportation, performance of all accessorial services at origin when directed, providing or assisting in securing labor for loading of shipment, settling or assisting in investigation and settlement of claims, verification of rates and extensions of shipping papers, packing and storage-in-transit at origin, and where directed by CARRIER, pickup at origin of all or part of the shipment, and collection of undercharges where they are payable at origin. An agent performing origin terminal service shall advise the customer of the name of the destination agent and shall advise the destination agent of the place where the customer can be reached at destination, probable time of arrival and all other necessary information for adequate service at destination.

(c) Hauling service, consisting of the provision of adequate equipment, loading, unloading and placement of shipments, execution of billing papers, movement of shipments between origin and destination, delivery at destination, collection of COD charges, and receipt for deliveries;

(d) Destination terminal service, consisting of contacting consignee prior to arrival of shipment, advising consignee of probable time of arrival, making arrangements with consignee for delivery of shipment, verification of rates and extensions of shipping papers, performance of all accessorial services at destination when directed, settling or assisting in investigation and settlement of claims, providing or assisting in securing labor for unloading of shipment, and collection of undercharges where they are payable at destination, and where directed by CARRIER, delivery at destination of all or part of the shipment;

(e) AGENT, when it is the booking agent on a shipment, shall endorse upon the freight bill and upon all copies of the order for service, including shipper's copy, the name of an agent of CARRIER qualified to perform the origin terminal service if shipment is not booked at origin, and likewise, in the case of shipments to be delivered by CARRIER, the name of an agent of CARRIER located at destination qualified to provide the destination terminal service, or in the case of shipments to be delivered on shipper's request to another warehouse or van line under tariffs of CARRIER authorizing such delivery, the name of such warehouse or van line; and

(f)     The qualifications of an agent to perform terminal service shall be as from time to time prescribed by the rules and regulations of CARRIER.

2.3     Performance Measurements. Recognizing the inherent difficulty in establishing scientifically precise quality standards within the context of a service industry, to be bound by CARRIER's measurements of performance, customer satisfaction, and quality notwithstanding the fact that such measurements may not result in a statistically accurate evaluation thereof.

2.4     Rules and Regulations. To comply with CARRIER's rules and regulations as referred to in paragraph 3.4 hereof.

2.5 ʹ    Agent Authority Policy. To comply in all respects with CARRIER's current Agent Authority Policy, as set forth in Exhibit 2.5.

13

2.6   <u>Required Self-Haul</u>. To service promptly with its own equipment any and all shipments it books (unless another agent accepts appointment as origin agent) or other shipments on which AGENT accepts appointment as origin agent involving hauls of less than 250 miles from or to its home terminal (or such other distance as CARRIER may prescribe), or of any distance if entirely intrastate. Upon request of AGENT, CARRIER may agree to service the shipment with equipment of another of its agents or of CARRIER.

2.7   <u>Lease of Equipment</u>. Upon CARRIER's demand, to provide and maintain under CARRIER's standard form Equipment Lease Agreement one automotive vehicle fully meeting CARRIER's then current equipment specifications and its just, fair and reasonable proportion of any additional such vehicles as shall be required by CARRIER in the conduct of its business; and, to perform and discharge faithfully, diligently and efficiently, all of AGENT's covenants, duties and responsibilities imposed in, or arising under, said Equipment Lease Agreement.

2.8   <u>Records and Reports</u>. To keep, record and report, in the manner and on the forms prescribed by CARRIER or competent governmental authority, full and complete records, accounts and statistics of all acts, operations and expenses relating to the performance by AGENT of any of its duties or responsibilities under this contract, and, in connection with the collection of charges on behalf of CARRIER, to hold such collections in trust for CARRIER until remitted by AGENT directly to CARRIER, or by processing through AGENT's regular account with CARRIER.

2.9   <u>Services Not Subject to Agency Contract</u>. To use its best efforts to provide adequate and appropriate transportation, warehousing, and related services to customers of CARRIER and its other agents with respect to household goods (as defined above in paragraph 1.14) when such services are agreed to be furnished by AGENT but are not because of their nature covered by this contract. AGENT will, upon CARRIER's request and if AGENT is in violation of CARRIER's financial standards established pursuant to its rules and regulations, participate in CARRIER's Intrastate Shipment Settlement Program for the remaining term of this contract.

2.10   <u>Locations</u>. That it will not change any of the locations at which it has been authorized to represent CARRIER, or open any new location at which it performs services for CARRIER or holds itself out as an agent of CARRIER, without first making written application to CARRIER for approval thereof and receiving such approval.

3.   CARRIER and AGENT mutually covenant as follows:

3.1   <u>Allocation of Liability.</u> The allocation, as between CARRIER and AGENT, of responsibility for liability to the public and to customers or shippers shall remain as set forth in CARRIER's Rules 9 and 15 and the Experience-Rated Cargo Claims Chargeback Program. Minimum insurance coverage levels included in Rule 9 and the flat rate recoveries specified in Rule 15 may be increased if deemed appropriate and necessary by an independent, outside insurance advisor.

3.2   <u>Billing of Customers</u>. If AGENT has the right, or should hereafter acquire the right, to bill customers of CARRIER for shipments booked by AGENT, AGENT may continue to do so,

or qualify to do so, provided it meets the reasonable financial standards established from time to time by CARRIER pursuant to its reasonable rules and regulations, including limits on the amount of unsecured balances owed CARRIER by AGENT.

3.3    Allocation of Revenue. The allocation of revenue among agents participating in a shipment shall be as set forth from time to time in CARRIER's reasonable rules and regulations. CARRIER will, in consultation with and pursuant to agreement of a Committee, establish from time to time a sliding scale of booking commission and hauling compensation such that for national account contract price discounts in excess of an agreed upon standard, the booking commission will be reduced and the hauling compensation will be increased by the amount of the reduction. The most recent such sliding scale has been established by CARRIER in consultation with agents as contemplated herein, to be effective on the date this Contract becomes effective, and will be published by CARRIER as the "Price Stability Guidelines." The Guidelines will be reviewed semi-annually, and the effective discount under existing customer contracts will be reevaluated each May.  Such Guidelines will not apply to accounts of CARRIER to the extent they are exempted in consultation with and pursuant to agreement of a Committee.

3.4    (A) Rules and Regulations. CARRIER has established and may from time to time establish additional fair and reasonable rules and regulations for the conduct of its operations and its relationship with AGENT under this contract.  Except as expressly limited by the terms of this contract, CARRIER from time to time may amend, supplement, modify or rescind any such rule or regulation.  In addition, AGENT may propose to CARRIER any amendments, supplements, modifications, or rescissions to such rules and regulations. CARRIER will consider the impact of such proposal on AGENT on CARRIER's other agents, and will within 30 days of receiving such proposal advise AGENT whether it will be adopted. For this purpose, AGENT may request a third party, including the Allied Agents Association, to make proposals and receive CARRIER's response thereto on its behalf. Except for the rules and regulations which are effective at the date hereof, additional rules and regulations, including all amendments, supplements, modifications, or rescissions thereof, shall not become effective on less than 30 days' written or telegraphic notice to AGENT.  In the event CARRIER makes any change in, or adds or deletes any rules and regulations, which AGENT believes adversely affects the profitability of its business with CARRIER, AGENT may object thereto by giving notice of objection to CARRIER within thirty (30) days of the publication of such change, addition or deletion.  If the parties are unable within a further thirty (30) days to agree on resolution of AGENT's objection, the matter shall be submitted to arbitration as provided in paragraph 3.13 below.  Pending the outcome of such arbitration, CARRIER may, subject to its having given the required 30-day notice, implement or continue in effect any such action.  If the arbitrators find CARRIER's action to have materially affected AGENT's profitability under this Contract, such action shall be rescinded as to AGENT, and, if such action has been implemented, CARRIER shall compensate AGENT for any loss of profitability under this Contract caused thereby.  Notwithstanding the foregoing, CARRIER may establish additional fair and reasonable penalties for violations of its rules and regulations or for failure to perform service in accordance with commitments to any customer made by CARRIER or any agent on CARRIER's behalf, provided that the amount of such penalties collected in any given year shall be used by CARRIER to offset the cost of violation of rules by AGENT and CARRIER's other agents, or to cover the costs of CARRIER in performing or arranging for

customer service following a service failure. To the extent not needed for either of such purposes, the amount of such penalties shall be refunded to AGENT and/or CARRIER's other agents in such manner as CARRIER deems appropriate to enforce compliance with rules.

(B) Rules of Engagement. CARRIER and AGENT will comply with the terms of Rules of Engagement set forth in Exhibit 3.4 to this contract. These Rules of Engagement will be subject to reasonable modification by CARRIER in consultation with and pursuant to agreement of a Committee, including the development of a Client Move Allocation Plan which when completed will be deemed a part of Exhibit 3.4.

(C) Sales Leads; Graphics. CARRIER will not charge AGENT for interstate sales leads generated (i) directly through its corporate URL home page "http://www.allied.com" or successor corporate URL or (ii) through its toll free corporate number (1-800-823-0755 or its successors) providing leads through its Call Center. CARRIER intends to continue to fund and grow the Call Center with a goal of 10,000 interstate moves from the Web Site and Call Center in 2005. AGENT will, at CARRIER's cost and using CARRIER's graphics, place on all trucks registered with CARRIER in CARRIER's committed fleet references to the "www.allied.com" or successor web site.

3.5    Limited Relationship. Except as herein specifically authorized, AGENT shall have no right to act for CARRIER, nor to obligate CARRIER in any manner or form whatsoever, and both AGENT and CARRIER will refrain from any specific or general holding out to the public that either represents the other for any purpose, or in conjunction with any business, except as herein specifically stated.

3.6    Service of Process. Nothing contained herein, nor in the relationship between CARRIER and AGENT shall authorize or empower either CARRIER or AGENT to accept or receive service of process on behalf of the other.

3.7    Independent Relationship. The relationship of the parties is, and is intended to be, that of principal and agent. CARRIER and AGENT are independent business organizations, and the employees of CARRIER and AGENT are the exclusive employees, respectively, of each. Nothing contained in the relationship between CARRIER and AGENT is intended to create an employer/employee relationship between CARRIER and AGENT or a joint employer relationship between them and the employees of either.

3.8    (A) Trademarks. CARRIER grants AGENT, for the term of this contract and not thereafter, limited license to use CARRIER's corporate name and registered service marks (trademark) in connection with AGENT's own business name, in advertising CARRIER's service, subject to CARRIER's prior approval. Nothing contained herein shall authorize AGENT to use CARRIER's name in, as, or as a part of AGENT's own corporate, trade or fictitious name. All names, trade names, trademarks, service marks, slogans, color combinations, designs, logos, copyrights and patents, etc., now or hereafter owned or used by CARRIER, are, as between CARRIER and AGENT, solely and exclusively owned by CARRIER, and neither are, nor ever will become, the property of AGENT.

(B)    Registration of Shipments. The parties agree that except as permitted under Exhibit 2.5, registration with CARRIER of each and every shipment of interstate household goods booked by AGENT, or other shipments subject to this contract, is of the essence of this contract. For this purpose, the term "household goods" shall be as defined in the Interstate Commerce Act and regulations thereunder as of October 1, 1995, whether or not such Act or regulations are thereafter amended or repealed.   A "shipment" means transportation for one shipper to one consignee under a single bill of lading or, if none, a single invoice, but if any shipment is transported on more than one vehicle, each separate vehicle will constitute a separate shipment for purposes of this Section 3.8. Any failure by AGENT to register such shipments, which should be transported by CARRIER pursuant to this contract, in advance of their loading, is a material breach of contract which prevents CARRIER from ensuring the qualifications of service providers, service performance, and quality of shipments associated with its name, subjects CARRIER and CARRIER's other agents to substantial injuries to their reputations, and may violate, and cause CARRIER to be in violation of, applicable federal and state laws.  It is further agreed that AGENT is so identified with CARRIER as to such shipments that any handling by AGENT of such a shipment without first registering it with CARRIER constitutes unfair competition with CARRIER and is a violation of the license granted to AGENT under paragraph (A) above.   The parties recognize that the damages suffered by CARRIER in the foregoing categories are substantial, but are intangible and impossible to quantify in advance. It is therefore agreed that as liquidated damages for the trademark license violation, unfair competition, and the damage to CARRIER's reputation directly and indirectly through damage to the reputation of other agents of CARRIER, and not as a penalty, AGENT shall pay to CARRIER for each and every such shipment (except those shipments described in the next sentence) a sum equal to twice the full tariff charges applicable to such shipment plus the cost of obtaining any temporary or permanent injunctive relief, including all costs of investigation and proof of facts, court costs and attorney's fees. CARRIER waives any right to recover these damages as to all shipments included in the first trip in any twelve-month period on which one or more unregistered shipments are transported by AGENT.  For this purpose, the term "trip" means a group of shipments loaded on to a single unit in the same geographic area all of which shipments are to be unloaded in a second geographic area or are loaded and/or unloaded en route between the two involved geographic areas.

CARRIER may also recover damages arising out of liability to the public or its customers for damaged or lost cargo caused by or related to AGENT's failure to register shipments with CARRIER. Without limiting CARRIER's rights under other provisions of this contract, CARRIER's rules and regulations or applicable law, it is agreed that CARRIER may, from time to time and on forty-eight (48) hours prior notice to AGENT, audit AGENT's registration procedures and documents, for purposes of determining compliance with the registration requirements of this contract. However, if AGENT has been previously found to have violated the registration requirements of this Section 3.8(B), then such advance forty-eight (48) hour notice is not required.

(C)    Termination of Trademark Use. Upon termination of this contract AGENT will no longer use the said names, trade names, trademarks, service marks, slogans, color combinations, designs, logos, copyrights and patents, etc., in any manner or in any capacity whatsoever.  Upon

AGENT's failure to fully comply with the provisions of this paragraph, AGENT shall pay CARRIER the sum of $100.00 per day for each day during which such failure continues, beginning with the 31st day following termination of this contract, the aforesaid sum being agreed upon by CARRIER and AGENT as the amount by which CARRIER has been damaged by AGENT's violation of this subparagraph (C), it being impossible to ascertain or prove the actual damage sustained.  This provision for liquidated damages shall in no way be construed as a waiver of CARRIER's right to obtain injunctive relief against AGENT's non-compliance with this provision and AGENT hereby agrees that its non-compliance with this provision shall cause CARRIER and CARRIER's other agents irreparable harm.

3.9    Laws and Regulations. All provisions hereof shall be executed and construed in a manner consistent with the Interstate Commerce Act and all other applicable laws, and with such lawful rules, regulations, and directives as are issued pursuant thereto.

3.10    International; Relocation Companies.

(A) International. Notwithstanding any other provision hereof this contract does not in any way limit the right of either party to conduct its international business (including shipments as a motor carrier between points in the contiguous United States on the one hand and other countries, other than Canada, on the other hand) and other businesses as it deems appropriate; provided, however, that for international shipments booked by AGENT with CARRIER's affiliate Allied International N.A., Inc., at the time of the original booking AGENT may designate, in its sole discretion, the origin and destination agents.

(B) CARRIER's Affiliated Relocation Companies. For at least so long as this Agency Contract is in effect and AGENT is in compliance with its obligations under this Agency Contract (including without limitation its financial obligations and CARRIER'S quality standards), CARRIER will, and will cause any third-party relocation services company ("RSC") which it then owns or with which it is then under common control to fulfill the following obligations:

(1) Continuation of AGENT Relationship With Customer. If AGENT directs a customer's business to the RSC, CARRIER will, until and unless such customer directs a change in booking agent, pay to AGENT a booking commission on the shipment revenues booked with CARRIER as provided in this contract. Subject to client approval AGENT will continue to be involved in providing service to the customer to the extent desired by AGENT. It is understood that such arrangements may include obligations of AGENT to continue providing agreed upon services for the client, including but not limited to maintaining relationships with key client decision-makers and maintaining current information on client relocation needs, and sharing such information with CARRIER and its RSC, with the objective of maintaining and increasing revenues. AGENT agrees that it will whenever services of the type offered by RSC are requested by a customer, give preference to RSC to the extent reasonably practicable.

(2) Relocation Brokerage Fees. CARRIER will cause its RSC to refrain from taking any transportation brokerage commission when AGENT is awarded business under any relationships created after January 1, 2003. This commitment does not apply to

18

relationships a relocation company has with its customers on the date it is acquired by the RSC or an affiliate which were in existence on the date of that acquisition, but the RSC and CARRIER will attempt to renegotiate such relationships, as existing agreements governing them become subject to renewal, on the basis of pricing that does not include such commissions.

(3) <u>AGENT Service to RSC</u>. CARRIER and AGENT recognize that neither this Contract nor any agreement with an RSC can limit the right of a client to book through the agent of its choice. Consequently, contingent upon and subject to an agreement between AGENT, CARRIER and the RSC that is agreeable to all three parties:

> (i) Nothing in this contract will prevent AGENT, with the approval of client, from withdrawing service for a client from RSC and placing the business with another service provider or providing service direct to the client consistent with other terms of this Agency Contract.

> (ii) Nothing in this contract will prevent AGENT from having the right at all times to maintain its relationship with any client tendered to the RSC for service, and

> (iii) The RSC will provide to AGENT at AGENT's request all information relating to the services being performed for any such client.

The provisions of this paragraph 3.10 (B)(3) do not in any way reduce the protections afforded AGENT as set forth in Sections 1.15(A) and 1.18 of this Contract.

(4) <u>Relocation Referral Commissions</u>. CARRIER will cause the RSC to pay commissions and perform the following obligations to AGENT:

> (i) <u>Existing Moving Customers</u>: For referrals by AGENT of customers for whom CARRIER in the twelve full months preceding the referral has provided significant moving services, the RSC will, subject to subparagraph (iii) below, pay AGENT a referral commission of $600 per homeowner transaction during the first year of business done with the referred customer, $200 per transaction during the second year, $100 during the third year, and $50 per transaction thereafter, all including business under a renewed contract. "Significant moving services" is defined as the lesser of $150,000 in actual invoiced linehaul revenue, or one-third of the customer's interstate moving business.

> (ii) <u>Non-Customers</u>: For referrals by AGENT of customers for whom CARRIER in the twelve full months preceding the referral has not provided significant moving services, the RSC will, subject to subparagraph (iii) below, pay a referral commission of $400 per homeowner transaction during the first year of business done with the referred customer, $200 per transaction during the second year, $100 during the third year, and $50 per transaction thereafter.

19

(iii) <u>Application of Referral Commissions</u>: Commissions under subparagraphs (i) and (ii) above will apply only for customers which have not done business with the RSC (or any company newly acquired by it or an affiliate) during the preceding two years.

(iv) Continuation of Referral Commissions: Following expiration of the initial contract between the RSC and the customers referred to under subparagraphs (i) and (ii) above, the RSC will continue to pay referral commissions to AGENT under any renewed contract as long as AGENT has actively participated in the renewal of that customer's contract and has continued to provide quality service to the customer as determined by the reasonable judgment of the RSC and Allied.

(v) <u>Timing of Payment</u>: The RSC will estimate the amount of commissions to be due as a result of transactions during a referred customer's first year. Within fifteen (15) days after execution of the initial customer contract ("the Signing Date"), the AGENT when it is the referring agent will be advanced a Signing Bonus equal to three-fourths (3/4) of that estimated amount. Payment of any additional commissions will be made within one month after the first anniversary of the Signing Date, and within one month after the end of each full calendar quarter thereafter, with the first (and if necessary subsequent) payments reduced to reflect any shortfall in the amount of commissions payable for actual transactions from the number of transactions on which the Signing Bonus was based.

(vi) <u>Reports</u>: Reports of the RSC's referral business will be made to AGENT at least quarterly, but CARRIER will strive to develop monthly reporting.

(5) <u>Relocation Volume Commitment</u>. The RSC will provide Four Thousand (4,000) shipments to CARRIER's network including AGENT and CARRIER's other agents in the first twelve full months after this agency contract becomes effective, Five Thousand (5,000) shipments in the second year, and Five Thousand Five-Hundred (5,500) shipments in the third year. So long as CARRIER's agent network has provided adequate capacity at an acceptable quality level, CARRIER will pay Five-Hundred Dollars ($500) for each shipment by which the RSC falls short of this minimum commitment. The aggregate amount of such payments will be distributed pro rata among CARRIER's agents including, if applicable, AGENT, based on their participation in business with the RSC during the year in which the shortfall occurred.

3.11    <u>Term and Termination</u>. The term of this contract shall be as set forth on the first page of this contract, and it shall continue thereafter until terminated by either party with or without cause upon 3 months' written notice to the other to be effective on or after the date on which the

Initial Term of this contract expires; provided, however, that the provisions of paragraph 3.8 shall survive the termination of this contract. During the term hereof, either party may terminate this contract for a material breach upon 10 days' notice to the other if and only if the breaching party, for a period of 30 days after notice so to do shall fail or refuse to cure or remedy any breach of this contract claimed in such notice, unless within such period the breaching party shall either (a) demand arbitration as provided in paragraph 3.13 hereof, in which case the contract may be terminated by the non-breaching party if the breaching party shall fail fully to comply with the award of such arbitration within 30 days after notice so to do; or (b) file an action or suit in a court of competent jurisdiction to enjoin such termination in which case the contract may be terminated by the non-breaching party if and only if there shall be no final decree or judgment of such court enjoining such termination. The provisions of paragraphs 1.4, 1.9 to 1.11, 1.15, 1.16, 1.21, 1.22, 1.23, and 3.10(D) and (E) of this Contract shall be suspended as to AGENT during any time at which (and for one year after) (i) CARRIER has notified AGENT of a material breach of this Contract and such breach has not been cured and has not been submitted to arbitration as permitted under paragraph 3.13 hereof, (ii) AGENT's quality rating is, as established pursuant to CARRIER's rules and regulations, unacceptable, (iii) the provisions of CARRIER's Rule 32 are applicable under the terms thereof, or (iv) AGENT has become subject to the liquidated damages provision of Section 3.8(B) above by failing to register shipments as referred to therein. CARRIER is under no obligation, whether pursuant to its Rule 9, its Rule 15, or otherwise, to indemnify or defend AGENT or to hold it harmless against any liability or cost whatsoever arising out of or connected in any way to any shipment serviced by AGENT which was not, before the commencement of such service, registered with CARRIER.

3.12    Termination for Multiple Breaches. Notwithstanding paragraph 3.11, CARRIER may terminate this contract upon 10 days' notice to AGENT (with no right by AGENT to cure) if (i) following two notices of breach of contract given to AGENT by CARRIER pursuant to paragraph 3.11 of this Contract followed by timely cure, a third breach of contract occurs within six months of the first such breach, or (ii) following three such notices of breach of contract followed by timely cure, a fourth breach of contract occurs within twelve months of the first such breach.

3.13    Arbitration. Any disagreement, dispute or controversy which arises between CARRIER and AGENT with respect to the enforcement, interpretation or application of any provisions of this Agreement or CARRIER's Rules and Regulations which cannot be resolved informally may be resolved by the appeal procedure below at the option of the CARRIER or AGENT.

a)    CARRIER or AGENT may demand arbitration, the decision of which arbitration shall be final and binding. A panel of seven arbitrators will be obtained from the American Arbitration Association, or other agreed-to source. CARRIER and AGENT will select a single arbitrator from the panel by alternatively striking arbitrators until one remains.

b)    CARRIER and AGENT will determine by a mutually agreeable method of random selection: (i) whether the arbitration will be held in the Chicago area or in the city in which AGENT's principal office is located, (ii) which party is to be designated the

21

complaining party, and (iii) which party is to begin the striking of arbitrators from the panel referred to in subparagraph (a) above.

c) Any dispute involving $2,500 or less and not involving significant, continuing contractual obligations will be arbitrated solely on the basis of written submissions and/or telephone conference calls among CARRIER, AGENT, their representatives and the arbitrator. If CARRIER and AGENT are unable to agree as to the amount in dispute or the existence of a continuing contractual obligation, the arbitrator will determine the amount in controversy or the existence of a continuing contractual dispute based upon written submissions and/or telephone conference calls.

d) If a dispute is submitted to arbitration, the hearing will be held within 60 days of the selection of an arbitrator unless the arbitrator is unable to schedule a hearing during that time in which case the hearing will be held at the earliest time the arbitrator can schedule a hearing.

e) The time limits established may be waived by CARRIER and AGENT by mutual agreement.

f) Each party to the dispute resolution under this provision will bear its own costs and expenses including attorney's fees, and will share equally in the costs and expenses of the arbitration proceeding.

g) A dispute must be submitted to arbitration within six months of its having arisen or prior to the expiration of any cure period associated with a Notice of Termination based on the same factual situation for which arbitration is sought.

3.14    <u>Transfer</u>. This contract may be transferred by AGENT with CARRIER's prior approval pursuant to this paragraph if AGENT is in compliance with the terms of this contract and the rules and regulations adopted pursuant thereto. The transferee shall make written application for the CARRIER's approval of the transfer. The application shall set forth the transferee's qualifications. If CARRIER finds, after due investigation, that the transferee (a) is equipped in the community where located adequately to perform or provide all the services required by CARRIER of an agent in the discharge of CARRIER's obligations, and (b) in the judgment of CARRIER, transferee has appropriate financial resources, experience and reputation requisite for the performance of such service, CARRIER shall approve and authorize the assignment of this contract to the transferee. A change in control of AGENT as determined by CARRIER shall be deemed a transfer of this contract for purposes of this paragraph. However, a transfer of control among existing shareholders of AGENT or among their family members shall be approved by CARRIER without the investigation referred to above if AGENT establishes to CARRIER's reasonable satisfaction that the financial condition of AGENT will not be materially harmed by such transfer.

3.15    <u>No Third Party Beneficiaries</u>. This contract is not intended to and does not confer any rights or benefits upon any person or entity other than the parties hereto, and any purported rights of third-party beneficiaries are expressly disclaimed.

3.16    <u>Waiver</u>. The failure of either party hereto (a) to enforce at any time any of the provisions of this contract, or (b) to exercise any option which is herein provided, or (c) to require at any time performance by the other of any of the provisions hereof, shall in no way be construed to be a waiver of such provisions, nor in any way to affect the validity of this contract, or the right of such party thereafter to enforce each and every such provision.

3.17    <u>Severability</u>. If any provision of this contract is declared unlawful or unenforceable, by judicial determination or otherwise, the remaining provisions of this contract shall remain in full force and effect. Should any particular covenant herein be held unenforceable for any reason, including without limitation the time period, geographical area and scope of activity covered by such covenant, then such covenant shall be given effect and enforced to whatever extent is enforceable.

3.18    <u>Governing Law</u>. This contract is made and entered into at Westmont, Illinois, and shall be interpreted in accord with the laws of Illinois, but not including its principles of conflicts of law.

3.19    <u>Amendments</u>. This contract may not be modified or amended in any way without the express written consent of the parties hereto.  Any notices required under this contract shall be sent to the attention of the Chief Executive Officer of the party to whom the notice is directed, at the address set forth on the first page hereof or such other address as may have been furnished in writing to the party giving notice.

3.20    <u>Effective Date; Integration</u>. This contract shall as of its effective date supersede and replace the current Agency Contract between CARRIER and AGENT, including any addenda thereto.  This Contract does not supersede historical practices which have been adopted by agreement between CARRIER and AGENT which practices existed on February 9, 1988 and have continued to the date hereof.

3.21    <u>Locations</u>. The location(s) in respect of which AGENT is authorized to represent CARRIER pursuant to this contract shall be the same as those authorized by CARRIER at the date this contract becomes effective.

EXHIBITS TO AGENCY CONTRACT

**Exhibit 1.4**

EXPENSE RATIO

The attached table sets forth the expense ratios applicable to various kinds of shipments. The expense ratio applies only to "transportation revenue," which consists of revenue derived from services contained in the transportation rate sections of CARRIER's common carrier tariff, excluding pickup and delivery from storage covered in the accessorial section of CARRIER's tariff, but including the amount of any increase in any of CARRIER's transportation rates adopted in place of the Insurance-Related Surcharge. For purposes of this paragraph, the revenue derived from particular services shall be calculated in accordance with CARRIER's reasonable rules and regulations adopted from time to time to achieve fairness in the distribution of revenue among CARRIER, AGENT, and CARRIER's other agents; provided, however, that (i) valuation revenue shall be deemed to be derived from national account contract shipments as to which CARRIER's Extra Care Protection Plan is furnished without charge, in an amount equal to 2% of CARRIER's full, undiscounted tariff charges applicable to all services including accessorial services performed with respect to such shipment, and (ii) valuation revenue shall be deemed to be derived from military shipments as to which CARRIER's valuation coverage is furnished without charge, in an amount equal to 80% of the price at which such coverage was offered on September 30, 1995, unless and until the military adopts a program in which valuation coverage is furnished without charge, in which event such shipments will be governed by clause (i) above, taken from the hauling compensation and booking commission payable to AGENT and/or CARRIER's other agents in accordance with CARRIER's rules and regulations as in effect from time to time. Valuation revenue derived under any national account contract which on January 1, 2005 was governed by revenue distribution provisions different from those set forth above will commencing with shipments loaded on and after the effective date of this Agency Contract be reduced by one-third (1/3).

If the services described above are reconfigured, then the maximum expense ratios for the affected shipment categories shall be recalculated so as to produce no greater dollar amount of revenue for CARRIER as it would have derived from the maximum expense ratios without such reconfiguration, including, as an example and not by way of limitation, the adjustments to "transportation revenue" on shipments priced under CARRIER's Total Price Guarantee Program. For the following purposes, "self-hauled" shipments are shipments hauled by the booking agent, or by the origin agent of an out-of-area booking, without the assistance of CARRIER's dispatch function. "Surrendered" shipments means all other shipments.

A. Surrendered Interstate 1st, 2nd, and 3rd Proviso Civilian Shipments -  499 miles or less: 10.75%

24

B. All Interstate and Intrastate 1st and 2nd Proviso Government and Military Shipments, both surrendered and self-hauled, 500 miles or more: 10.75%.

C.  Interstate 1st and 2nd Proviso Civilian Shipments -  500 miles or more, both surrendered and self-hauled: 10.75%.

D. Interstate 3rd Proviso Civilian Shipments of Electronics and Displays- 250 miles or more, both surrendered and self-hauled: 10.75%

E. Self-Hauled 1st, 2nd, and 3rd Proviso Shipments of 249 miles or less---Interstate Civilian, Interstate and Intrastate Government and Military : 4.00%

F. Self-Hauled 1st and 2nd Proviso Shipments more than 249 miles and less than 500 miles---Interstate Civilian, Interstate and Intrastate Government and Military:     6.00%

G. Self-Hauled Interstate 3rd Proviso Shipments - Electronics and Displays - 249 miles or less: 4.00%

H. Self-Hauled or surrendered Interstate 3rd Proviso shipments subject to Tariff 200-C and amendments and reissues thereof:

    1.  4.00% = 280 miles or less

    2.  10.75% = 281 miles or more

I. All surrendered Interstate 3rd Proviso Shipments - Electronics and Displays: 10.75%.

J. Surrendered Intrastate 1st and 2nd Proviso Shipments - Non-Military/Government:

    1.  8.75% =  (a) California intrastate booked by participating California agent

    2.  15.00% = California Intrastate surrendered by non-participating California agent

    3.  7.50% = Texas Intrastate

    4.  10.75% = All other Intrastate

K. Self-Hauled Intrastate 1st and 2nd Proviso Shipments - Non-Military/Government:

    1.  2.00% = California booked by participating or non-participating agent

    2.  4.00% = Texas

    3.  2.00% = All Others

L. Self-Hauled Intrastate 3rd Proviso Shipments - Electronics and Displays - 249 miles or less: 4.00%

M. Self-Hauled Intrastate - Electronics and Displays - 250 miles or more: 10.75%.

Notwithstanding the foregoing, the booking commission paid by CARRIER on applicable shipments booked by AGENT will be increased through an adjustment in the expense ratio as set forth below, based upon the period-to-date through-account transportation revenues on interstate and intrastate shipments booked by AGENT with CARRIER or military freight forwarders or

25

military motor carriers owned by CARRIER as measured immediately prior to CARRIER's initial processing of the shipment during the relevant Measurement Period:

| Cumulative Through-Account Booked Transportation Revenue | Expense Ratio Applicable to Shipments Within Bracket | Increase in Booking Commission |
|---|---|---|
| First      $ 1,243,847 | 10.75% | 0 |
| 1,243,848  to  1,865,825 | 10.50% | .25% |
| 1,865,826  to  2,487,695 | 10.25% | .50% |
| 2,487,696  to  3,731,650 | 10.00% | .75% |
| 3,731,651  to  4,875,497 | 9.75% | 1.00% |
| 4,875,498  to  6,219,344 | 9.50% | 1.25% |
| 6,219,345  to  7,463,191 | 9.00% | 1.75% |
| 7,463,192  to  9,950,994 | 8.50% | 2.25% |
| 9,950,995  to  12,438,688 | 7.50% | 3.25% |
| 12,438,689 to  14,926,491 | 7.00% | 3.75% |
| 14,926,492 to  17,124,798 | 6.50% | 4.25% |
| 17,124,799 to  20,356,970 | 6.00% | 4.75% |
| 20,356,971    and    above | 5.00% | 5.75% |

For this purpose: (i) Each "Measurement Period" shall last one year, and the first Measurement Period under this Contract shall begin April 1, 2005. Booking commission reductions for prior Measurement Periods will be governed by the terms of the Agency Contract between CARRIER and AGENT as in effect on March 1, 2005. (ii) The dollar brackets listed above shall be increased by a percentage (the "Inflation Rate") equal to the annual General Price Adjustment calculated pursuant to Item 40 of the Rules and Regulations of Tariff 400-N (and reissues and revisions thereof) published by the Household Goods Carriers Bureau Committee (or equivalent successor statistic). The percentage to be used shall be the General Price Adjustment which becomes effective the January 1 on or prior to the beginning of the applicable Measurement Period. If neither the General Price Adjustment nor a successor is available, then the percentage shall be equal to the implicit annual price deflator (or equivalent successor statistic) used by the United States Department of Commerce in calculating the Gross National Product for the relevant period. (iii) The "transportation revenue" shall be adjusted on shipments priced under CARRIER's Total Price Guarantee program so as to be comparable to the transportation revenue on other shipments. (iv) "Applicable shipments" means shipments which are otherwise subject to a 10.75% expense ratio as set forth above, and shipments which would be subject to such an expense ratio but for the application of the Price Stability Guidelines established pursuant to Section 3.3. Shipments booked with military freight forwarders or military motor carriers owned by CARRIER will be treated as "applicable shipments," but only that portion of revenue from such shipments which is directly subject to CARRIER's 10.75% expense ratio will be eligible for booking commission reduction. (v) "Cumulative Through-Account Booked Transportation Revenue" means the through-account transportation revenues on all interstate and intrastate shipments booked by AGENT with CARRIER or military freight forwarders or military motor carriers owned by CARRIER, regardless of the category of shipment or level of expense ratio. (vi) These expense ratio adjustments affect only the booking commission. Other compensation due AGENT will not be affected. (vii) Applicable shipments booked by agents of CARRIER under common ownership with AGENT as of the date hereof shall be combined in determining the revenues on shipments booked by AGENT. Treatment of shipments booked by agents of CARRIER which become commonly owned with AGENT after the date hereof shall be as agreed upon between CARRIER and AGENT. However, during the term of this contract following the acquisition of or creation of common control by AGENT of another CARRIER agent or the assets or sales personnel thereof (hereinafter "acquired agent"), the expense ratio applicable to shipments booked by such acquired agent shall not be reduced below 7.0 % or, if lower, below the lowest expense ratio applicable to the acquired agent at the time of such acquisition or creation of common control. For purposes of this paragraph only, common ownership requires that at least 85% of the voting power and 85% of the economic interest (including both entitlement to ordinary dividends and liquidation proceeds) in each entity are held ultimately by the same natural person or persons. CARRIER's determination as to whether or not common ownership exists in other circumstances shall be conclusive.

The expense ratio reduction will be accomplished as follows:

1.    Estimate of Average Booking Commission Increase

    (a) At the beginning of each Measurement Period, CARRIER will estimate the average booking commission increase AGENT is expected to earn during that Period.

    (b) This estimate will be calculated by applying the expense ratio brackets applicable during the Measurement Period to AGENT's applicable bookings during the preceding twelvemonths.

    (c) The estimated average is subject to adjustment by CARRIER during the Measurement Period if in CARRIER's reasonable opinion it appears AGENT's applicable bookings during that Period are likely to be significantly different from the bookings on which the estimate was based.

2.    Payment of Booking Commission Increases

    (a) At least once each three months, CARRIER will separately credit AGENT's statement with an amount equal to at least 95% of the estimated average booking commission increase on shipments processed since the most recent credit.

    (b) Within 60 days after the end of each Measurement Period, CARRIER will furnish AGENT a final reconciliation of the results therefor and will credit or charge, as appropriate, AGENT's statement.

3.    Minimum Expense Ratio

    (a) Beginning May 1, 2005 the Minimum Expense Ratio will be Sixty Thousand Dollars ($60,000.00) annually. In the event that the aggregate of the expense ratio applied to government, military, and civilian interstate and intrastate shipments booked by AGENT in any Measurement Period is less than that Minimum Expense Ratio amount, AGENT's statement shall after the end of such Measurement Period be charged the amount of the shortfall. CARRIER may at its option charge one twenty-fourth (or one-twelfth) the estimated shortfall (based on AGENT bookings during the prior Measurement Period) to each statement (or every second statement) issued to AGENT during any applicable Measurement Period. Through the term of this Agreement the Minimum Expense Ratio will be applicable only to CARRIER's agents who maintain one or more locations in one of the Largest 60 US Markets.

  (b) The "Largest 60 U.S. markets" for any Measurement Period are the markets which CARRIER has determined, based on statistics from the American Moving and Storage Association or its successor, are the 60 largest markets by revenue (all product lines) booked by agents in such market. By executing this contract, AGENT acknowledges receiving from CARRIER a copy of the list of such markets, showing whether or not AGENT is subject to the Minimum Expense Ratio.

**Exhibit 1.6**

## MARKETING REVENUE

1. CARRIER's collection of transportation revenue pursuant to paragraph 1.6 shall be made from the following types of shipments:

**I.    Interstate Only:**

1st and 2nd Proviso Civilian and Non-military Government surrendered shipments moving 249 miles or less.

All 1st and 2nd Proviso Civilian and Non-military Government shipments moving 250 miles or more.

All 3rd Proviso Electronic shipments moving 250 miles or more.

**II.    Intrastate Only:**

3rd Proviso Electronic surrendered shipments moving 250 miles or more.

**III.    Interstate and Intrastate:**

1st and 2nd Proviso Military shipments moving 250 miles or more with no linehaul reduction.

3rd Proviso Electronic surrendered shipments moving 249 miles or less.

3rd Proviso Display surrendered and self-hauled shipments moving 250 miles or more.

3rd Proviso Display surrendered shipments moving 249 miles or less.

**Exhibit 2.5**

## AGENT AUTHORITY POLICY

### I.    Motor Carrier Household Goods:

With the exception of Kingpak type authority noted in III below, AGENT may not, directly or indirectly, hold authority to transport household goods or operate as a carrier of household goods in interstate or foreign commerce.

### II. Services for Other Motor Carriers of Household Goods:

AGENT may not, directly or indirectly, perform services for other motor carriers of household goods, with the following exceptions:

    A.    AGENT may, as permitted by MTMC, represent another motor common carrier of household goods for military traffic. Such representation shall be restricted to the performance of origin or destination terminal services.

    B.    AGENT may perform storage-in-transit, pickup and delivery services for another carrier on interstate shipments consisting solely of machinery (including auxiliary and component parts thereof) which, because their unusual nature or value require the specialized handling and equipment usually employed in moving household goods. For such services, AGENT shall issue a CARRIER bill of lading naming the carrier who tendered the shipment as consignor.

AGENT may accept all other non-military shipments into permanent storage from another carrier as a public warehouseman, and perform delivery out on either his own bill of lading if such delivery is intrastate, or on a CARRIER bill of lading as a CARRIER shipment if such delivery is interstate. No part of such services may be performed on the bill of lading of the tendering carrier, and such shipments shall not be accepted into storage-in-transit.

### III.   Kingpak Authority:

AGENT may hold that type of authority, commonly known as Kingpak authority, in his own right.

### IV.   Regulated Freight Forwarder Authority:

AGENT may not, directly or indirectly, hold regulated freight forwarder household goods authority from the Interstate Commerce Commission ("I.C.C.") or its successors.

### V. Services Performed for Regulated Freight Forwarders:

AGENT may perform terminal services for regulated freight forwarders of household goods on both military and non-military shipments moving in either foreign commerce or in domestic interstate commerce. Terminal services include the transportation of forwarder shipments between residence and warehouse, both within and outside the terminal area of the regulated freight forwarder. When such transportation is outside the terminal area, it may be performed under AGENT's I.C.C. Kingpak authority or under the certificate of CARRIER.

**VI.    Exempt Freight Forwarders:**

    A.  AGENT may function as an exempt freight forwarder, and issue his own bill of lading in that capacity, for shipments of household goods moving in foreign commerce.

    B.  AGENT may not, directly or indirectly, function as an exempt freight forwarder for shipments of household goods moving in domestic commerce.

**VII.   Services Performed-for Exempt Freight Forwarders:**

    A.  AGENT may perform terminal services for an exempt freight forwarder of shipments of household goods moving in foreign commerce, using either a CARRIER bill of lading, or his own bill of lading in the event that he has Kingpak type authority.

    B.  AGENT may not, directly or indirectly, perform terminal services for an exempt freight forwarder of shipments of household goods moving in domestic interstate commerce.

**VIII.  Air Freight Forwarding:**

    A.  AGENT may act as an air freight forwarder for shipments of household goods moving in foreign commerce.

    B.  AGENT may not, directly or indirectly, act as an air freight forwarder for shipments of household goods moving in domestic interstate commerce in competition with CARRIER or its affiliates.

**IX.    General Commodity Authority:**

AGENT may not perform services on interstate shipments of uncrated household goods under any general commodity authority which AGENT may directly or indirectly hold.

**X. Services for General Commodity Carriers:**

AGENT may not, directly or indirectly, perform services on interstate shipments of uncrated household goods for general commodity carriers.

**XI.    Household Goods Brokers:**

AGENT may not, directly or indirectly, hold a license or operate as a motor carrier broker of household goods shipments.

**XII.   Modification or Repeal of Regulation:**

Regardless of any modifications to or the repeal of the Interstate Commerce Act, this policy will be interpreted and enforced to prohibit AGENT from performing services which would have been prohibited by this policy under the statutes, regulations and decisions in existence as of October 1, 1991.

**Exhibit 3.4**

**RULES OF ENGAGEMENT**

## I.  Definitions

- **Rules of Engagement ("Rules")** – The set of rules agreed to by SIRVA Relocation LLC, Allied Van Lines, Inc. and North American Van Lines, Inc. and agents of each van line, and set forth below,  that governs each party's conduct in the sale and pricing of interstate van line moving services and participation in the sale of relocation services to corporate customers (also known as national accounts), and government account customers. All references to price, price terms and pricing (including commissions) in these rules relate to the rates for interstate motor carrier transportation of household goods and services incidental to that transportation ("interstate moving services") that will be offered to these customers by or on behalf of the respective van line.  All discussions contemplated by these Rules shall include the relevant van line and the appropriate agents as set forth below.

- **Incumbent** – for purposes related to the Rules of Engagement between Allied and Northamerican, the definition of "incumbent" shall be determined by referring to the Incumbent Determination Matrix attached to and incorporated into these Rules.  For the Rules between Allied agents, incumbency will have a less structured definition and will be determined by the van line taking into account the history of all agents involved after discussion with all such agents.  In all cases, however, a signed agreement between the van line and the subject customer is a requirement to evidence incumbent status.  The only exception to this rule is where the van line through an agent receives moves directed by the account to them that are governed by a third party relocation company agreement. In this case, written evidence from the account of the directed relationship is required.  In all cases, international household goods business as well as domestic shall count in determining incumbency status.

- **Controlling Share** – for purposes related to the Rules of Engagement between Allied and Northamerican, the definition of "Controlling Share" is also determined using the Incumbent Determination Matrix.  Controlling Share refers to the agent who has the largest share of the account, once the minimum number of annual  moves as stated on the Matrix is exceeded.  That minimum number, and Controlling Share, are determined by comparing only the shares of agents of SIRVA-affiliated van lines also servicing the account.  Controlling Share does not consider the portion(s) of the account served by  van lines, agents of van lines, or third parties not affiliated with SIRVA.  For the Rules between Allied agents, Controlling Share will have a less structured definition and will be determined by the van line based on the history of all agents involved after discussion with all such agents.

- **Price Protection** – The ability for the van line to determine, in cooperation with the incumbent agent, the price and terms at which the van line will contract with the subject account.  No other agent will be allowed by the van line to offer interstate moving services of the van line that exceed the net effective value of said price and terms.

32

- **Commissionable Relocation Transactions** – for purposes of these rules, a commissionable relocation transaction shall be defined by the standard detailed in the current Agent Relocation Commission Plan in effect or in the Allied Van Lines Agency Contract, as applicable.

## II.  Accounts Involving a Third Party other than SIRVA Relocation

1) Moves directed to the van line through an agent by a corporate customer via a third party other than SIRVA Relocation, for which the contract between the third party and the van line was obtained by the agent,  do not constitute incumbency.  Therefore, the "No Incumbent" rules below shall apply.

2) If the aforementioned contract is "account specific" (meaning it exists solely for the servicing of the subject corporate account which is specifically named in the agreement) or if the account sends the van line written notification that it is directing moves to the named agent (i.e. a letter or e-mail to Contract Carriage, currently Steve McKenna), then that agent shall, at a minimum, receive the benefits of Price Protection during any competitive bids involving the account.  (All agents with such relationships are strongly encouraged to obtain such written notification and to contact their respective van line's Pricing Team to secure a separate APN number for each account specific agreement.)

3) If moves are directed but no account specific agreement exists and a written statement from the client is not obtainable, the agent is not entitled to Price Protection nor to the disclosure of the specifics of competitive pricing requested by other agents.  The subject agent will, however, receive notification of the fact that a competitive price has been requested by another agent, as long as the van line is aware of the subject agent's relationship.  It is the responsibility of the agent to make the van line aware of all such relationships

## III.  Rules of Engagement Between Allied and Northamerican

1) **Accounts in which no incumbent agent from either van line exists:**

   a) Pricing and contract terms will be negotiated by the respective agent and the van line.

   b) Dedicated sales support will be provided to all agents at the brand level when requested.

   c) Members of the van line Pricing Team from each brand will share information among themselves re: the pricing and terms for interstate moving services being offered by the other, in order to create an environment in which neither van line supports competition within its own network for the business of its existing customers based on price.  Criteria such as service levels, references, and capabilities – but not price - should be the basis of competition between Allied and Northamerican.  The Pricing Team member will, therefore, assume the role of coach with respect to pricing decisions, when communicating with the agent.

2) **Accounts in which one or more Incumbent(s) with low volume exist(s):**

    a) This section refers to accounts where two or more agents have less than a Controlling Share of the account, as defined by the Incumbent Determination Matrix.

    b) Pricing and related contract terms will be negotiated by the respective agent and the van line.

    c) Incumbent agents will be notified by their van line's Pricing Team of all impending actions and pricing/terms changes by other agents.

    d) Dedicated sales support will be provided to each agent at the brand level when requested.

3) **Accounts in which an incumbent with Controlling Share exists:**

    a) This section refers to accounts where an agent possesses a Controlling Share of the account as defined by the Incumbent Determination Matrix.

    b) The incumbent shall receive Price Protection. Pricing and economic contract terms will be controlled by the van line in cooperation with the incumbent agent. No other agent will be allowed by the van line to offer interstate moving services of the van line that exceed the net effective value of said price and terms.

    c) All agents will be provided dedicated sales support at the brand level, when it is requested.

4) **Proposal Development:**

    a) This section refers to all situations in which a written proposal document (RFP, RFQ, RFI or generic proposal) is to be submitted to the account.

    b) When requested by an agent eligible for such support, the SIRVA Proposal Support Team will develop a proposal document utilizing a moving proposal specialist dedicated to the subject brand

    c) Brand specific strategies to be reflected in the document will be developed among the branded agency system, the van line's corporate sales or account management representative(s) and the van line's Pricing Team.

    d) Agents may choose to develop proposals on their own, using their own resources, provided, however, that they submit a draft document to SIRVA's Proposal Support Team upon request, at least 24 hours prior to the due date of said document. SIRVA's purpose in reviewing such documents is to ensure the consistency, accuracy and efficacy of any and all representations regarding the van line and/or SIRVA.

    e) No sharing of competitive information between the dedicated brand specialists shall occur. Further, the SIRVA Proposal Support Team shall in no way use any competitive information obtained by one agent to benefit another(Agents who feel this rule has been violated should make their concerns immediately known to the SIRVA SVP Sales.)

## IV.  Rules of Engagement Between Allied Agents

1) **Accounts in which no incumbent Allied Agent (as defined by the Matrix) exists**:

   a) Pricing and contract terms will be determined at the van line level and shared with all agents competing for the account.

   b) The contract will be negotiated by a reaching a consensus between the van line and all agents involved.  If the van line and the agents do not reach consensus regarding pricing and terms in a reasonable period of time, the van line's Pricing Team and Sales management will decide on appropriate pricing and terms.

   c) **Formal RFP Sales Support** – when an RFP or similar document is received by multiple Allied agents, sales  support will be provided to each agent as requested.  The van line's sales representatives shall consistently represent only the van line's "story" (i.e. those features, benefits, facts and data and competitive advantages  that pertain to the van line) and shall refrain from representing or recommending one agent over another to the prospective account

   d) **Non-RFP Sales Support** – where the account is not out for a formal bid, the van line's sales representative will support the agent who first requested such support,  through the successful closing of the sale ,unless no significant results in progressing the sale are achieved within a reasonable period of time, in which case the van line sales representative may choose to support the efforts of another agent at his/her discretion.

2) **Accounts in which one or more incumbent Allied Agent(s) exist(s):**

   a) This section refers to accounts where one or more Allied agent(s) are incumbents.  The terms "incumbency" and "Controlling Share" for purposes of this section will be determined by the van line taking into account the history of all agents involved after discussion with all such agents. The agent network and the van line have a long history of working amicably together in determining pricing and strategy on accounts where more than one agent is involved.  Generally, the agent with the most moves on record for the previous twelve month period shall be deemed to have a Controlling Share of the account.  When the history of and discussion with all such agents does not result in a clear conclusion as to incumbency, however, the van line shall decide the status of each agent involved.

   b) Pricing and contract terms will be controlled by the van line in cooperation with the incumbent agent with Controlling Share.

   c) Non-incumbent agents will be provided the final price and contract terms agreed to between the incumbent agent and the van line.

   d) Notification of pricing and terms will be made by the van line Pricing Team within a reasonable period of time but no later than 36 hours prior to the due date of the RFP or pricing document to the account.

e) All incumbent agents will be provided sales support for the account when requested.

f) Non-incumbent agents will not be provided corporate level sales support, regardless of whether the situation involves a formal RFP or not, unless there is clear evidence put forth by the van line that the incumbent(s) will likely not retain the business under any reasonable scenario (i.e. the client will likely terminate the incumbent(s) via the RFP). In such rare cases, the van line will notify the endangered incumbent(s) of its intent to support other agents in winning the account. Incumbents who disagree with such rulings can appeal to the AAA sales and marketing committee, which shall then use its best efforts to resolve the dispute fairly with the van line.

## V. Rules of Engagement on Accounts involving International Moving

1) The selling of International Moving Services is not governed by these Rules.

## VI. Rules of Engagement Between SIRVA Relocation and Allied Agents

1) **Participation in Relocation Sales**

   a) All agents in the Allied system booking Corporate Business will be allowed to participate in the sale of SIRVA Relocation services provided that they adhere to the rules contained herein.

2) **Process for Registering Relocation Leads**

   a) All leads must be screened prior to their registration, to ensure there are no conflicts with other agents or SIRVA. No sales support will be initiated prior to this screening process and the official registration of the lead.

   b) It is the responsibility of each agent to inform SIRVA of all national accounts it is working on or planning to work on so that each account can be screened and vetted by SIRVA against the database(s) and customer list(s) that would indicate whether an incumbent or SIRVA relationship already exists at each. All requests should be sent to the SIRVA Agent Coordinator (currently Thyra Romito in Westmont) for screening.

   c) It is the responsibility of each agent to inform SIRVA of all national accounts that may be governed by a third party relocation agreement even though the account directs the third party to send its moves to the van line through the agent. Such directed accounts shall be noted in the contract database via the issuance of a separate APN number, provided that the agent is able to provide the Allied Contract Team with some written evidence from the account that the account is, in fact, directing its moves to the agent. This written evidence will provide the agent with full rights of incumbency as outlined in the document.

   d) SIRVA will inform the incumbent agent of any requests for lead registration by other agents, upon receipt of such requests. The incumbent(s) shall have right of first refusal to work the

lead with SIRVA Relocation. In no case shall the non-incumbent agent work the relocation lead or be credited for it without first obtaining the consent of the defined incumbent(s).

e) SIRVA will use its best efforts to check all available databases and records (including but not limited to the SIRVA contract tracking database and salesforce.com) to determine whether there is/are qualified incumbent(s) already servicing the account, and/or whether another agent or SIRVA Relocation has already successfully registered the lead.

**3) Relocation Leads in which there is no incumbent Allied Agent**

a) Once a lead has been successfully screened, as per Paragraph VI. 2. b. above, the Agent sales representative is free to develop the lead into a meeting and an opportunity worthy of protection as an "exclusive lead registration."

b) In prospecting for and developing Relocation leads, in no circumstance shall an agent representative represent him/herself as working for SIRVA or SIRVA Relocation. Failure to comply with this rule will result in immediate termination from the SIRVA Relocation sales program.

c) Once a representative has satisfied the following criteria, they will be granted a "temporary exclusive" status that protects the lead from activity by other agents:

    i. The appropriate Moving Services corporate representative is involved in the pursuit

    ii.     An appointment is set to meet with the prospect (or a conference call, if appropriate)

d) No account will be considered permanently protected until an agent and SIRVA sales person have had an initial meeting with the prospect and the relationship is moving forward, as evidenced by an accepted Champion Letter consistent with SIRVA's Customer Centric Selling practices. A new "exclusive lead registration" status is then granted and will last as long as the agent and SIRVA representative(s) can evidence, to SIRVA sales management's satisfaction, that the prospect is progressing.

e) Where there is no incumbent on the account, and moving services are won as a result of the relocation sale, the placement of shipments will be governed by the Client Move Allocation Plan. (to be attached)

**4) Relocation leads submitted by a non-incumbent where one or more incumbents exist**

a)     The incumbent(s) shall be notified of the lead and shall have right of first refusal to work the lead. In no case shall the non-incumbent agent work the relocation lead or be credited for it without first obtaining the consent of the defined incumbent(s).

**5) Relocation leads where there are multiple Allied incumbent agents**

a.   Accounts that have more than one qualified incumbent that subsequently purchase commissionable services from SIRVA Relocation shall be shared by the incumbent agents on a move-by-move basis for purposes of relocation commission allocation. This means that whichever incumbent receives the household goods move authorization for the individual transferee shall also receive any and all relocation commissions payable relative to that transferee.

b.   If any household goods move authorizations are to be sent at the client's direction to a van line not affiliated with SIRVA, then the relocation commissions associated with said moves, if any, shall be shared among all participating agents of SIRVA-affiliated van lines. Each agent's share of such commissions will be in proportion to its share of the household goods business it is awarded for the subject account.

6) **Relocation leads where another SIRVA brand submits a lead where there is an Allied incumbent**

a.   The incumbent shall be notified of the lead and shall have right of first refusal to work the lead. In no case shall the non-incumbent agent work the relocation lead or be credited for it with out the consent of the defined incumbent.

7) **Relocation leads where both SIRVA brands are incumbents and one incumbent agent submits the lead**

a.   In the event that there are multiple incumbents from more than one SIRVA-affiliated van line on the account, the same rules stated in Section VI. 5. above shall govern the disbursement of relocation commissions to the incumbent(s) of each brand.

8) **Relocation Leads where there is a single Allied incumbent but another one or more SIRVA-affiliated van lines are to begin receiving moves as directed by the account**

a.   All commissionable relocations shall be credited to the incumbent Allied agent.

9) **Relocation leads in which the incumbent Allied agent is failing**

a.   In rare cases in which an incumbent is failing to the extent that the account desires to change moving vendors, either in the course of purchasing relocation services or as a separate matter, SIRVA shall use its best judgment and efforts to aid in the restoration of the incumbent. Failing those efforts, it may be necessary to suggest an alternative Allied agent or agents to service the account, in order to preserve the business for the network.

b.   In all cases in which SIRVA becomes aware of a failing incumbent, SIRVA shall notify the incumbent principal of his/her agency's potential failure. SIRVA shall then use its best efforts to direct all subsequent communications regarding said failure through the agency principal.

10) **Leads that are denied by SIRVA**

a.   Agents that are denied participation in the relocation sales process with SIRVA may market the account with another 3rd party relocation services company.  Pricing and contract terms for moving services will be controlled using the rules set forth above in Section  in item I. through IV. above. Nothing in this paragraph is intended to limit the ability of agents to sell to or otherwise deal with other 3rd party relocation services companies.

b.   Agents that are denied participation in the relocation sales process with SIRVA may still call on the account to sell moving services only, but may not represent SIRVA Relocation products or services in the process.

## 11) Leads that are successfully closed by SIRVA Relocation and the agent

a.   The registered agent on leads that are closed successfully is:

   i.   Entitled to any Relocation Commissions, as provided  by a separate plan or by contract with the agent.

   ii.  Entitled to book a share of the van line business if it is won as part of the relocation sale.  Share size and disbursement of individual moves shall be governed by a separate Client Move Allocation Plan.

## 12) SIRVA Relocation generated Leads

a.   Where SIRVA Relocation receives a potential lead or has the opportunity to develop a potential lead on its own, the Lead Screening procedure detailed in Paragraphs VI. 2. a. through c. above shall be followed.

b.   Any incumbent agent(s) surfaced through the screening process shall be notified immediately of SIRVA's intent to work the lead, at which time the agent may pursue one of the following courses of action:

   i.   The agent may request that SIRVA not call on the prospect due to circumstances that may jeopardize the agent's moving business.

   ii.  The agent may offer to actively support and participate in the sales process, at which time the agent can register the lead.

   iii. The agent may decide to not actively support the sales process as it goes forward, in which case the lead will not be registered to that agent.  The agent will still, however, retain all the rights of incumbency on the moving portion of the account.

c.   SIRVA acknowledges that no Allied agents will be precluded from registering a national account lead opportunity, provided that the agent can meet all of the current guidelines for lead registration.  SIRVA will make every reasonable effort to partner with Allied agents in the pursuit of national account opportunities for both relocation and household goods business.  However,

    i.   if SIRVA has a documented sale pending, and no agent of a SIRVA-affiliated van line has registered the account, SIRVA may elect to place the acquired household goods business by following the Client Move Allocation Plan.

    ii.   if SIRVA is pursuing the account, and the account has not yet published an RFP document and/or SIRVA does not have a documented sale pending, any Allied agent who can meet the established registration guidelines will be allowed to register the account. Lead registration by the agent shall include the rights set forth elsewhere in these Rules with respect to booking shipments as well as agent relocation commissions, should the account become a client.

## VII.  Rules governing the disbursement of household goods moves from accounts won by SIRVA Relocation as a result of a lead from an agent

1) Where the client chooses to be serviced by the agent who produced the lead and to contract directly with the van line, said agent shall be the booker of record for all the account's moves provided that said agent continues to meet the service level expectations of the client. Should the agent fail to meet said expectations, then SIRVA shall follow the provisions for a failing agent set forth in section VI., 9) above. SIRVA shall not preemptively take action to discontinue moves to a failing agent without first following said provisions. Additionally, SIRVA shall use its best efforts to proactively train and support all agents who sign national accounts in delivering the highest service levels possible, to minimize their risk of failure.

2) Where the client chooses to be serviced by a third party relocation company move management model in which the third party is required to use multiple agents and/or carriers and to ensure by client proxy that the client's service level expectations are met, the Client Move Allocation Plan will determine how the client's moves are to be disbursed. Except as inconsistent with any special provisions required by the client that may conflict with said Plan, SIRVA shall use its best efforts to award as much of the client's moves to the agent who produced the lead, provided that said agent can continually meet the service level expectations set forth by the client and the Client Move Allocation Plan.

3) SIRVA Relocation shall not charge a move management, booking fee nor distribution fee to agents for participation in the Client Move Allocation Plan, except as set forth in the Allied Van Lines Agency Contract.

## VIII.  Changes or Amendments to The Rules

These Rules shall constitute a complete document and shall supersede any other rules except those separate documents, such as the Incumbent Determination Matrix, the Agent Relocation Commission Plan, and the Client Move Allocation Plan, which are referred to in these Rules. These Rules are subject to the terms of, and may be amended as provided in, the Allied Van Lines Agency Contract. To maximize compliance and minimize confusion, SIRVA shall use its best efforts to communicate these Rules and all subsequent changes thereof to the appropriate SIRVA associates

and to the network and shall use a document tracking system that clearly states the version number and release date of new issuance of these Rules.

JUDGE    DARRAH
MAGISTRATE    JUDGE DENLOW

**SIRVA**    Statement    Archive    Transaction    Templates    Request    Admin    My Profile    Logout

**Display** 15    **Search** - Select -    **Brand** AVL    **Agent Code** All 747

**From** May 2008 1st Half **To** May 2008 1st Half    [Search]    [Reset]

| Agent Name | Statement Period | Net Debit Balance | Net |
|---|---|---|---|
| 7479000 EDWARDS MOVERS, INC. | May 2008 1st Half | 96,642.63 | |
| | **Total** | **96,642.63** | |
| | **Net Balance** | **96,642.63** | |

**Total: 1    Record(s)** 1    **through** 1



| Statement | Archive | Transaction | Templates | Request | Admin | My Profile | Logout |

**Display** 15  **Agent** 7479-000 EDWARDS MOVER

**EDWARDS MOVERS, INC.**

**Search** -Select-

**7 LOIS LANE**

**Filter** All    [ Search ]   [ Reset ]

**SOUTH EASTON , MA  023750**

**Period** **May 2008 1st Half**    Debit  **96,642.63**    Credit   Net  **96,642.63**

| SUMMARY | DEBITS | CREDITS | ALL |

| Batch | Source | Reference | Debit |
|---|---|---|---|
| **Total** | | | **96,642.63** |
| **Net Balance** | | | **96,642.63** |
| ⊞ 001 | Balance Forward | 📄 | 96,642.63 |

==================================================================================

Agent Statement payments received thru **May 16, 2008** appear on this agent statement.

Please remit to:
    SIRVA Agency Services
    24277 Network Place
    Chicago, IL 60673-1277

This agent statement was available on **May 20, 2008**.

Settlement dates for this agent statement are as follows:
- Agent debit balances must be received by **Jun 03, 2008** or postmarked by **May 31, 2008**.
- Agents with credit balances will be paid by check on **May 27, 2008** or by electronic fund transfer on **May 27, 20**

==================================================================================

    **Total: 1**  **Record(s)** 1   **through** 1

📄 - View Contact Information  ▢ - View SISTRS Documents